

For opinion see 2009 WL 4748554, 129 S.Ct. 2859, 129 S.Ct. 1400

<<Material appearing in DIGEST section, including Topic and Key Number classifications, Copyright 2010 West Publishing Company>>

Supreme Court of the United States.
AMERICAN NEEDLE, INC., Petitioner,
v.
NATIONAL FOOTBALL LEAGUE, et al., Respondents.
**No. 08-661.**
September 24, 2009.
On Writ of Certiorari to the United States Court of Appeals for the Seventh Circuit

Amicus Curiae Brief of Economists in Support of Petitioner

CRAIG C. CORBITT Counsel of Record JANE N. YI ZELLE HOFMANN VOELBEL & MASON LLP 44 Montgomery Street, Suite 3400 San Francisco, CA 94104 (415) 693-0700 Robert Baade David Berri Timothy Bresnahan Dennis Coates Craig Depken II Rodney Fort Ira Horowitz Brad Humphreys Lawrence Kahn Leo Kahane Stefan Kesenne Roger Noll James Quirk Allen Sanderson Martin Schmidt John Siegfried John Solow Stefan Szymanski Lawrence White Andrew Zimbalist Counsel for Amici Economists

COMPLETE LIST OF REPRESENTED AMICI
(University affiliations listed for identification only):

Robert Baade, Lake Forest College

David Berri, Southern Utah University

Timothy Bresnahan, Stanford University

Dennis Coates, University of Maryland Baltimore County.

Craig Depken II, University of North Carolina Charlotte

Rodney Fort, University of Michigan

Ira Horowitz, University of Florida

Brad Humphreys, University of Alberta

Lawrence Kahn, Cornell University

Leo Kehane, California State University, East Bay

Stefan Kesenne, University of Antwerp

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Roger Noll (retired), Stanford University

James Quirk (retired), California Institute of Technology

Allen Sanderson, University of Chicago

Martin Schmidt, College of William and Mary

John Siegfried, Vanderbilt University

John Solow, University of Iowa

Stefan Szymanski, City University London

Lawrence White, New York University

Andrew Zimbalist, Smith College.

**\*i** TABLE OF CONTENTS

INTEREST OF THE AMICI CURIAE ... 1

I. Issues Presented in This Case ... 3

A. Relevant Economics Research ... 5

B. Relationship of Economics Research to This Case ... 7

SUMMARY OF ARGUMENT ... 11

ARGUMENT ... 14

I. Efficiency-Enhancing Collaboration ... 14

A. Markets vs. Rules and The Theory of the Firm ... 15

B. Sports Leagues as Standards Organizations ... 17

C. Alternative Ways to Perform League Functions ... 21

D. Sources of Value For NFL Teams ... 28

II. Centralization of Some Core Business Activities Has No Efficiency Rationale ... 31

A. Rule of Reason Analysis of Product Licensing ... 32

**\*ii** B. The Leap from Licensing To Other Business Activities ... 35

C. Optimal Competitive Balance ... 36

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

D. Competitive Balance and Layer Market Competition ... 41

E. Competitive Balance and Revenue Sharing ... 44

F. Anticompetitive Effects of Pooled Television Rights ... 48

CONCLUSION ... 49

### *iii TABLE OF AUTHORITIES

#### CASES

American Needle, Inc. v. Nat'l Football League et al., 538 F.3d 736 (7th Cir. 2008) ... 9

American Needle, Inc. v. New Orleans Louisiana Saints, et al., 496 F. Supp. 2d 941 (N.D. Ill. 2007) ... 10

McNeil v. Nat'l Football League et al., 790 F. Supp. 871 (D. Minn. 1992) ... 43

**Shaw v. Dallas Cowboys Football Club, Ltd. 172 F.3d 299 (3d Cir. 1999**) ... 49

#### STATUTES

15 U.S.C. § 1291 ... 14

#### OTHER AUTHORITIES

Randall W. Bennett & John L. Fizel, Telecast Deregulation and Competitive Balance, 54 Am. J. Econ. & Soc. 183 (1995) ... 37

Burhan Biner, Equal Strength or Dominant Teams: Policy Analysis of NFL (Working Paper 2009) ... 31

Jeffrey Borland & Robert MacDonald, Demand for Sport, 19 Oxford Rev. Econ. Pol'y 478 (2003) ... 30

*iv Yang-Ming Chang & Shane Sanders, Pool Revenue Sharing, Team Investments, and Competitive Balance in Professional Sports: A Theoretical Analysis, 10 J. Sports Econ. 409 (2009) ... 37

Ronald H. Coase, The Nature of the Firm, 4 Economica 386 (1937) ... 15

Ronald H. Coase, The Problem of Social Cost, 3 J.L. & Econ. 1 (1960) ... 13

Craig A. Depken II, Fan Loyalty in Professional Sports: An Extension to the National Football League, 2 J. Sports Econ. 275 (2001) ... 31

Craig A. Depken, II & Dennis P. Wilson, The Efficiency of the NASCAR Reward System, 5 J. Sports Econ. 371 (2004) ... 27

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

E. Woodrow Eckard, Free Agency, Competitive Balance, and Diminishing Returns to Pennant Contention, 39 Econ. Inquiry 430 (2001) ... 36

Sonia Falconieri, Josef Sakovics & Frederic Palomino, Collective Versus Individual Sale of Television Rights in League Sports, 2 J. Eur. Econ. Ass'n 833 (2005) ... 47

Michael A. Flynn & Richard J. Gilbert, The Analysis of Professional Sports Leagues as Joint Ventures, 111 The Econ. J. F27 (2001). ... 50

David Forrest, Rob Simmons & Stefan Szymanski, Broadcasting, Attendance and the Inefficiency of Cartels, 24 Rev. Indus. Org. 243 (2004) ... 47

Rodney Fort, Competitive Balance in North American Professional Sports, in Handbook of Sports Economics Research (2006) ... 37

*v Rodney Fort & James Quirk, Cross-Subsidization, Incentives and Outcomes in Professional Team Sports Leagues, 33 J. Econ. Literature 1265 (1995) ... 36

Rodney Fort & James Quirk, Optimal Competitive Balance in a Season Ticket League, Econ. Inquiry (forthcoming) ... 37

Rodney Fort, The Golden Anniversary of "The Baseball Players' Labor Market," 6 J. Sports Econ. 347 (2005) ... 14

Paul Hadley, James Ciecka & Anthony C. Krautmann, Competitive Balance in the Aftermath of the 1994 Players' Strike, 6 J. Sports Econ. 379 (2005) ... 37

Ira Horowitz, Sports Broadcasting in Government and the Sports Business (1974) ... 49

Lawrence M. Kahn, The Sports Business as a Labor Market Laboratory, 14 J. Econ. Perspectives 74 (2000) ... 13

Stefan Kesenne, The Impact of Pooling and Sharing Broadcast Rights in Professional Team Sports, 4 Int'l J. Sport Fin. 211 (2009) ... 47

Sue Kirckhoff, Batter Up! Sports Economics Hits Field, USA Today (2006) ... 6

Young Hoon Lee, The Impact of Postseason Restructuring on the Competitive Balance and Fan Demand in Major League Baseball, 10 J. Sports Econ. 219 (2009) ... 37

Roger G. Noll, Attendance and Price Setting, in Government and the Sports Business (1974) ... 31

Roger G. Noll, Broadcasting and Team Sports, 54 Scot. J. Pol. Econ. 400 (2007) ... 47

*vi Roger G. Noll, The Economics of Baseball Contraction, 4 J. Sports Econ. 367

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2003) ... 37

Roger G. Noll, The Economics of Promotion and Relegation: The Case of English
Football, 3 J. Sports Econ. 169 (2002) ... 45

Roger G. Noll, The Organization of Sports Leagues, 19 Oxford Rev. Econ. Pol'y 530
(2003) ... 18

Thomas Peeters, Competitive Balance and Broadcasting Rights in European Football
(2009) ... 47

James Quirk & Rodney D. Fort, Pay Dirt: The Business of Professional Team Sports
(1992) ... 29

James Quirk & Rodney D. Fort, Pay Dirt (2d ed. (1997) ... 36

Placido Rodriguez, Stefan Kesenne & Jaume Garcia, Sports Economics After Fifty
Years: Essays in Honor of Simon Rottenberg (2006) ... 6

Stephen F. Ross & Stefan Szymanski, Antitrust and Inefficient Joint Ventures: Why
Sports Leagues Should Look More Like McDonald's and Less Like the United Nations,
16 Marq. Sports L.J. 213 (2006) ... 27

Stephen F. Ross & Stefan Szymanski, Fans of the World Unite! A (Capitalist) Mani-
festo for Sports Consumers (2008) ... 27

Simon Rottenberg, The Baseball Players' Labor Market, 64 J. Pol. Econ. 242 (1956)
... 6

Allen R. Sanderson & John J. Siegfried, Thinking about Competitive Balance, 4 J.
Sports Econ. 255 (2003) ... 37

*vii Gerald Scully, The Business of Major League Baseball (1989) ... 43

Stefan Szymanski & Stefan Kesenne, Competitive Balance and Gate Revenue Sharing in
Team Sports, 52 J. Indus. Econ. 165 (2004) ... 36

Stefan Szymanski & Tommasso M. Valletti, Promotion and Relegation in Sporting Con-
tests, Revista de Politica Economica (2005), http:// www.dsl.psu.edu/centers/ ...
45

Stefan Szymanski, The Economic Design of Sporting Contests, 41 J. Econ. Literature
1137 (2003) ... 18

Peter von Allmen, Is the Reward System of NASCAR Efficient?, 2 J. Sports Econ. 62
(2001) ... 26

Andrew M. Welki & Thomas J. Zlatoper, U.S. Professional Football: Game Day Attend-
ance in 1991, 15 Managerial & Decision Econ. 489 (1994) ... 31

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Andrew M. Welki & Thomas J. Zlatoper, U.S. Professional Football Game Day Attendance, 27 Atlantic Econ. J. 285 (1999) ... 31

Oliver E. Williamson, Markets and Hierarchies: Analysis and Antitrust Implications (1975) ... 17

Andrew Zimbalist, Baseball and Billions (1992) ... 43

Andrew Zimbalist, May the Best Team Win: Baseball Economics and Public Policy (2003) ... 47

### *1 INTEREST OF THE AMICI CURIAE

This brief is submitted on behalf of a group of economists with experience in undertaking research on the economics of sports and/or antitrust economics. [FN1] Our goal is to provide information to the Court on whether, as a matter of economic analysis, a sports league properly should be regarded as a "single entity" that, in principle, cannot cause anticompetitive harm by collaborating in core business activities. As economists, we address this issue by examining the net effect on consumers and/or input suppliers if teams collaborate in a specific area of the business operations, taking into account the efficiency benefits of organizing a sport into a league and the anticompetitive harm from *2 reducing competition among teams. This brief describes the consensus among research economists about the relationship between the structure of a league and its operating efficiency, the efficient scope of competition among teams within a league, and the extent of competition between a league and other forms of entertainment and recreation.

> FN1. No counsel for either party was in any way involved in preparing this brief. No person other than amicus curiae and their counsel made any financial contribution to pay for the preparation and submission of this brief. Many of us have served as experts for teams, leagues, players associations, broadcasters and other entities in prior sports antitrust cases, but none of us are serving in this capacity in this matter. Counsel of record received timely notice of amicus curiae's intent to file this brief under Supreme Court Rule 37.2 and gave its consent to the filing.

Our principal conclusion is that economic research provides a clear basis for distinguishing between collaborative activities among members of a league that enhance economic efficiency and benefit consumers from collusive activities that are not essential for the efficient operation of a league and that benefit league members by reducing competition among teams. We believe that a ruling that any sports league is a single entity in which teams cannot engage in anticompetitive collaboration in "core venture functions" [FN2] is inconsistent with the consensus among economists about the efficient *3 scope of league authority and the nature of competition in professional sports.

> FN2. Brief for the NFL Respondents, On Petition for a Writ of Certiorari to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the United States Court of Appeals for the Seventh Circuit, p. 4 (henceforth NFL Brief).

As citizens and professional economists, we have a substantial interest in fostering the appropriate use of economics in antitrust and in assuring that the economic assumptions that guide decisions in antitrust litigation do not conflict with the consensus from economics research both generally and with respect to professional team sports. The NFL Respondents highlight our interest in this matter by referring to their preferred approach to the single entity concept as "a more nuanced, economics-based approach." [FN3]

    FN3. Ibid., p. 5.

I. ISSUES PRESENTED IN THIS CASE

The National Football League Respondents characterize the issues before the Court as follows:
  Whether, under the standards articulated in Copperweld, a professional sports league and its separately owned **4 member clubs, which collectively produce an entertainment product that no member club could produce on its own, constitute - or at least can function as - a single entity for Section I purposes.
  Petitioner American Needle characterizes the issues to be decided as:
  Are the NFL and its member teams a single entity that is exempt from rule of reason analysis under Section I of the Sherman Act simply because they cooperate in the joint production of NFL football games, without regard to their competing economic interests, their ability to control their own economic decisions, or their ability to compete with each other and the league? [FN4]

    FN4. Petition for a Writ of Certiorari, p. ii.

NFL Respondents seek a determination that they should be regarded as a single entity with respect to the "core venture functions" [FN5] of the NFL. Respondents claim that among these core functions are "where to locate its clubs..., rules governing ownership qualification..., how to present its integrated entertainment product to viewers on a national basis, rules governing the equipment that **5 may be used by players in games, and terms and conditions of player employment, as well as the trademark licensing activities that are the subject of this lawsuit" (footnotes omitted). [FN6]

    FN5. NFL Brief, p. 4.

    FN6. Ibid., pp. 10-11.

We understand from this statement that Respondents seek a blanket exemption from antitrust liability for acting collaboratively in all important markets for both inputs (including players, stadiums, and game equipment) and outputs (including product licensing, local marketing of games, and broadcasts and other reproduc-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

tions of games that may not be covered by the Sports Broadcasting Act). Respond-
ents seek a ruling that would reverse numerous antitrust decisions in which the
NFL and its member teams were found to have violated antitrust laws.

A. Relevant Economics Research

For over 50 years economists have studied the **6** sports business. [FN7] This re-
search initially focused on the effects of league rules that restrict competition
in the market for players, but subsequently examined other aspects of leagues,
such as membership, team location, broadcasting, schedules, the organization of
leagues, and the implications of this research for antitrust policy.

> FN7. Simon Rottenberg, The Baseball Players' Labor Market, 64 J. Pol. Econ.
> 242-58 (June 1956). The golden anniversary of this article was celebrated at
> an international conference, published as Placido Rodriguez, Stefan Kesenne
> and Jaume Garcia, Sports Economics After Fifty Years: Essays in Honor of Si-
> mon Rottenberg (2006).

Today sports economics is a large subfield of economics. Over 100 American col-
leges reportedly offer courses in this area. [FN8] Sports economics has two pro-
fessional societies, the International Association of Sports Economists and the
North American Association of Sports Economists, and two refereed professional
periodicals, the Journal of Sports Economics and the International Journal of
Sport **7** Finance. [FN9] Specialized journals publish most research in the field,
but many articles have appeared in leading general economics journals. Among these
are the American Economic Review, Canadian Journal of Economics, Economic Journal,
Journal of Economic Perspectives, Journal of Political Economy, Quarterly Journal
of Economics, Scottish Journal of Political Economy, and the Journal of Economic
Literature.

> FN8. Sue Kirckhoff, Batter Up! Sports Economics Hits Field, USA Today, July
> 27, 2006.

> FN9. Many of the economists who are submitting this brief are regular con-
> tributors to these journals, members of at least one of their editorial
> boards, and/or officers in the two professional societies.

B. Relationship of Economics Research to This Case

Research on sports economics bears directly on arguments and assertions in Re-
spondents' Brief. Respondents state that "professional sports leagues ... produce
a product that no member club could produce on its own." [FN10] Respondents fur-
ther state: "The NFL produces an entertainment product known as 'NFL Football,' an
annual, highly integrated series **8** of professional football games..." [FN11] In
discussing the effects of potential antitrust liability for collective decisions,
Respondents claim that "core business decisions of the league may be subject to
the uncertainty of a full rule-of-reason analysis... For the NFL and other nation-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

wide joint ventures, that uncertainty chills collaboration and decision making, and it inevitably decreases interbrand competition." [FN12]

    FN10. NFL Brief, p. 4.

    FN11. Ibid., p. 1.

    FN12. Ibid., p. 9.

 These assertions raise three issues that economics research has addressed. [FN13] First, what products does a sports league produce and what activities does a league performs that teams are unable to undertake as efficiently by themselves? Second, is the most efficient form of a sports league a highly integrated joint venture that controls all **\*9** important business functions of member teams, or does a high degree of integration generate profits for team members only because it reduces inter-team competition? Third, are the products of sports league sold in an entertainment product market or some other broad product market that makes interbrand competition a relevant concern for determining the competitive effects of collaborative activities?

    FN13. We note that all three issues have been addressed in numerous prior antitrust cases against Respondents and other professional and amateur sports organizations, but as economists we leave to others the task of reviewing the case law pertaining to sports.

 Respondents do not spell out the efficiency benefits that arise from a highly integrated league in which member teams are not allowed to make independent, competitive decisions in locating teams, acquiring inputs, or selling outputs. The opinions of the District Court and the Court of Appeals mention three such potential efficiency benefits.

 The first asserted efficiency benefit of a league is derived from creating a schedule of matches that eventually lead to a season championship. [FN14] The economic issue that is raised by this observation is **\*10** whether these and similar league functions (such as creating playing rules and standards of conduct) require a high degree of economic integration among teams in a league.

    FN14. American Needle, Inc. v. Nat'l Football League, et al., 538 F.3d 736, 737 (7th Cir. Aug. 18, 2008).

 The second asserted efficiency benefit is to promote competitive balance, which means that differences in the playing strength of teams are sufficiently small that the outcome of individual games, the eventual winner of the league championship, and the likelihood of a successive championship seasons are sufficiently uncertain that fan interest is maintained. [FN15] The economic issue that underpins this claim is whether a high degree of economic integration increases competitive balance and fan interest.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN15. *American Needle, Inc. v. New Orleans Louisiana Saints, et al.,* 496 F. Supp. 2d 941, 944 (N.D. Ill. 2007). The District Court states the "need for competitive balance" without explaining what it means, but in other litigation involving sports and in economics research, competitive balance is defined as in the text.

The third efficiency benefit, pertaining to licensing team marks and logos, is to facilitate inter-**\*11** brand competition by promoting interest in the league, allowing licensees to acquire licenses for all teams in one negotiation, and jointly enforcing the intellectual property rights in team marks and logos. [FN16] Whether these factors reduce costs and/or enhance inter-brand competition is an empirical matter. The relevant empirical evidence pertains to whether centralized licensing reduces costs and whether the relevant market for product licensing includes marks and logos for teams in others sports or, alternatively, whether the marks and logos for two teams in the same league are much closer substitutes than the marks and logos of two teams in different leagues.

FN16. Ibid. at 942.

SUMMARY OF ARGUMENT

A professional sports league is a form of standards organization for a group of teams that produce products that are in part complements (they mutually produce a season of games leading to a **\*12** championship) and in part substitutes (they compete for customers and inputs). Economics research concludes that league activities that are standards, such as schedules, playing rules, other behavioral rules for participants increase consumer welfare. Economics provides no basis for concluding that obtaining these efficiency benefits depends on collaboration in all core business activities.

For collaboration in other business activities to be justified requires showing that collaboration in that activity is necessary to improve efficiency. Neither economic theory, the history of United States sports, nor international comparison supports the claim that to operate efficiently leagues must extend the scope of their activities into the "core venture functions" cited by Respondents. Economics provides no basis for concluding that the most efficient organizational structure of a league is a joint venture among member clubs.

Economics research provides no support for the claim that integrating core business functions of **\*13** teams in a league contributes to competitive balance. The Coase Theorem states that, in the absence of transactions costs and wealth effects, the assignment of a property right has no effect on how a market allocates an asset. [FN17] Empirically, economics research finds that competitive balance has not been improved, and, because transactions costs are not zero, in some cases has been made worse, by centralizing some core business activities, such as allocating players among teams and jointly selling television rights.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. Ronald H. Coase, The Problem of Social Cost, 3 J.L. & Econ. 1-44
(October 1960). Soon after the publication of Coase's classic paper, econom-
ists recognized that the analysis of player markets in Rottenberg, op. cit.,
is closely related to the Coase Theorem. For summaries of this relationship,
see Lawrence M. Kahn, The Sports Business as a Labor Market Laboratory, 14
J. Econ. Perspectives 74-94, especially 86-89 (Summer 2000) and Rodney Fort,
The Golden Anniversary of "The Baseball Players' Labor Market," 6 J. Sports
Econ. 347-58 (November 2005).

Economics research shows that decentralized, independent decisions by each team
about core business functions improve efficiency. For example, pooled sale of
over-the-air television rights, which was legalized in the United States by the
Sports *14 Broadcasting Act, 15 U.S.C. § 1291, et seq., caused a reduction in the
number of games televised in local television markets. The termination of the
NCAA's control of televised college football games caused a substantial increase
in the number of games available on television.

ARGUMENT

I. EFFICIENCY-ENHANCING COLLABORATION

The economic basis for the single-entity concept rests in a concern of economists
about the choice between markets and hierarchies (rules and commands) as a means
of coordinating economic activity. In economics, a firm is not a legal entity, but
a group of private economic agents who coordinate their economic activities using
rules and commands rather than relying solely on transactions based on market
prices. Ronald Coase set forth the first coherent explanation of the factors that
*15 determine the boundary of the firm and decisions by private economic agents
between market and non-market means of coordinating economic activity. [FN18]

FN18. Ronald H. Coase, The Nature of the Firm, 4 Economica 386-405 (November
1937).

A. Markets vs. Rules and The Theory of the Firm

Economics research examines how markets allocate resources, and concludes that
competitive markets normally allocate resources efficiently. Economics also stud-
ies the use of rules and commands to allocate resources, and concludes that the
efficiency of this approach is limited by diseconomies of scale, inadequate in-
formation, and the opportunity for strategic behavior to evade rules. Despite the
advantages of markets over hierarchies, the ubiquitous presence of both institu-
tions raises several questions: under what conditions is either more efficient,
how does a group of economic actors *16 choose between markets and hierarchies,
and how should this analysis affect antitrust policy? [FN19]

FN19. A classic work that addresses these issues is Oliver E. Williamson,
Markets and Hierarchies: Analysis and Antitrust Implications (1975).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The economic forces that define the efficient scope of a firm, and hence that underpin the concept of a single entity, are the relative costs of market transactions versus rules and commands as a means to organize economic activity. Transactions costs include the cost of negotiating transactions between two or more parties and the additional cost of monitoring and enforcing contracts. The costs associated with rules and commands include the costs of negotiating, monitoring, and enforcing rules, and of making decisions with less information due to the absence of prices.

The concept of a single entity is very close to the concept of a firm. A group of firms that seek to coordinate their economic activities faces two choices about how they interact. The first is to engage in market transactions, in which case relative bids and **17** offers (prices) are used to coordinate behavior. The second is to merge or to create a joint venture in which rules and commands serve this function. As Coase recognized, groups that use rules and commands exist because in some situations market allocation is inefficient due to transactions costs. In a competitive industry, the decision of a small group of firms to coordinate economic activity through a merger or joint venture is driven solely by efficiency considerations. But if the group of firms represents all or most of the firms in the industry, it may choose an inefficient hierarchy over market transactions because the former creates substantial market power that offsets the efficiency losses.

B. Sports Leagues as Standards Organizations

A technical standards organization is an example of efficiency-enhancing non-market collaboration. Technical standards are valuable when independently produced products must work **18** together. For example, a toaster must be compatible with the power from an electric utility, and a computer must be compatible with software and peripheral equipment. Standards that permit efficient joint operation of complementary products often are developed by a consensus standards body that includes horizontal competitors.

A technical standard is a product in the economic sense. Some standards are proprietary intellectual property. The owner of the standard can then charge a royalty to other firms that adopt that standard.

Economists have applied the framework of the boundaries of the firm and the economics of standardization to study the organization of sports leagues. [FN20] The key insight from this analysis is that a group of competitors (whether football teams or tennis players) can add value if they collaborate to **19** adopt standards of play. As the Respondents use the term, "NFL Football" is a set of standards that have been promulgated by 32 professional football teams through their joint venture, the NFL.

FN20. See, e.g., Roger G. Noll, The Organization of Sports Leagues, 19 Oxford Rev. Econ. Pol'y 530-551 (Winter 2003), and Stefan Szymanski, The Eco-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

nomic Design of Sporting Contests, 41 J. Econ. Literature 1137-87 (December 2003).

One function of a league is to create playing rules. Standardization of rules avoids the necessity to negotiate rules for each contest, as initially occurred in football. The first intercollegiate "football" games were scheduled between Princeton and Rutgers in 1869. [FN21] The first game, a version of soccer featuring teams of 25 players, was played under Rutgers rules, and Rutgers won, 6-4. The second game, played under Princeton rules, was a version of soccer that, as in contemporary Irish and Australian football, allowed players to catch the ball, stop in their tracks, and take a free kick. Princeton won this match in a rout. A third game to determine the season champion was never staged because, quite **\*20** naturally given the earlier results, the two schools could not agree on the rules. The failure to coordinate a third match caused a loss of welfare for both players and consumers who would have attended the game.

> FN21. Professional Football Research Association, The Journey to Camp: The Origins of American Football to 1889,
> www.the-game.org/history-originsto1889.htm (last visited Sept. 23, 2009).

Another useful cooperative function among sporting contestants is to schedule matches that lead to a championship. This activity has value because consumers express greater demand for sports that produce identify the best team over a season of matches.

The standardization function of the NFL adds to the value of the products of the 32 member clubs in the same way that other standards organizations add to the value of products that make use of them. Just as it would be foolish to expose all firms in the Electronics Industry Association (EIA) to antitrust liability for participating in the EIA's Joint Electron Devices Engineering Council (JEDEC), which develops common technical standards for complementary electronics products, it would be **\*21** equally foolish to expose NFL member teams to antitrust liability for meeting to develop playing rules or to select the date and location of the Super Bowl. But the value of standardization has no relevance to whether members of JEDEC ought to be able to create a joint venture for exclusive marketing of consumer electronics products, and likewise has no relevance to whether NFL team should be able to collaborate in input and output markets in which they otherwise would compete. To justify the latter requires a separate justification that joint marketing efficiencies are sufficient to offset any anticompetitive effects.

C. Alternative Ways to Perform League Functions

In most professional team sports in the United States, the function of making and enforcing rules of play and behavior are assigned to a league that is a joint venture of the teams. This organizational form is not essential to the effective performance of these functions, as illustrated by professional team sports **\*22** in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

other nations, some other professional sports in the U. S., and college sports in
the U.S. Whereas agreements among league members are required to schedule matches,
the delegation of all scheduling to a league is unnecessary and can be ineffi-
cient. The reason is that centralized control of all scheduling by a single league
eliminates the possibility for creating other events that consumers value.

The top European soccer teams play in their nation's major league, but they also
participate in other championships. The United Kingdom provides a useful comparis-
on because the popularity and financial success of the top British soccer teams
and the top NFL teams are similar. Teams in the English Premier League play each
other twice to determine a league champion. [FN22] These teams also **23** enter the
Football League Cup (a tournament for all 92 professional soccer teams from all
four professional leagues) [FN23] and the Football Association Cup (a tournament
open to all teams including local amateurs). [FN24] The top four Premier League
teams qualify for the European Champions League in the following season, and the
fifth, sixth and seventh best Premier League teams normally qualify for the UEFA
Europa League competition, [FN25] both of which **24** are organized by the Union of
European Football Associations (UEFA), the governing body for soccer in Europe.

FN22. The English Premier League is the top professional soccer league for
England and Wales, and presently has 20 members. The Football League con-
sists of a hierarchy of three other professional leagues - the Championship
League, League One, and League Two - that include 72 more teams. Below
League Two is a hierarchy of amateur and semi-professional leagues with hun-
dreds of teams. The Football Association is the governing body for soccer in
England, and includes all amateur and professional clubs as members. It op-
erates four levels of leagues below League Two, has supervisory authority
over the Premier League and leagues below level 8, but has no supervisory
role over the Football League, which operates independently.

FN23. Carling Cup History, http://
www.oleole.com/england/competitions/carlingcup/history/ehi15.html. Although
Premier League teams are not members of the Football League, they particip-
ate in the FL Cup.

FN24. The 2009-2010 tournament has 762 entrants. The Football Association,
http://
www.thefa.com/TheFACup/FACompetitions/TheFACup/NewsAndFeatures/2009/FACupSta
rts.aspx. Although the FA has no supervisory authority over the FL, its mem-
bers participate in the FA Cup.

FN25. Qualification for the UEFA Europa League is complicated. The winners
of the FA Cup and the FL Cup automatically qualify for the UEFA Europa
League Cup if these teams have not qualified for either the Champions League
or the UEFA Europa League by virtue of their standings in the Premier
League. If the FA Cup winner has otherwise qualified, the other team in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FA finals qualifies unless it, too, already has qualified for either tourna-
ment. If both finalists have otherwise qualified, the FA's Europa League
spot goes to the sixth place team in the Premier League. If the FL Cup win-
ner has otherwise qualified, its spot in the UEFA Europa League goes to the
next highest team in the Premier League team (6th or 7th). Because teams
that are not members of the Premier League can win the FA and FL Cups, it is
possible for a UEFA Europa League slot to go to a minor league team.

American intercollegiate sports provide another approach to obtain the effi-
ciency-enhancing advantages of common rules and a season champion. In college
sports, rules of play and behavior are created and enforced by the National Col-
legiate Athletic Association (NCAA). The NCAA is a membership organization that
includes over 1000 colleges and universities and the conferences in which they
play. The NCAA schedules national championships in most but not all intercollegi-
ate sports. Most scheduling is the responsibility of conferences, which are the
counterparts to leagues in **25** professional sports. Conferences create a schedule
of games that leads to a conference champion.

Members of intercollegiate conferences do not play all matches against other con-
ference members. Colleges make bilateral agreements to play non-conference games,
which enable them to schedule an array of different opponents each year and to de-
velop popular rivalries outside of a conference (e.g., Notre Dame vs. Michigan,
Florida vs. Florida State, Army vs. Navy). Third parties organize special games or
tournaments that are separate from the regular conference season and NCAA champi-
onship events. Examples are most bowl games and pre-season basketball tournaments.
In college football, the six strongest conferences organize the Bowl Championship
Series, whereby the champions of each conference plus four other top teams meet in
five bowl games.

The National Association for Stock Car Auto Racing (NASCAR) is an example of how
a league can **26** be separated from teams. [FN26] NASCAR is a commercial entity
that establishes standards for stock car racing and stages a championship series
of races. The teams that race in NASCAR are separate entities, and compete with
each other for prize money in races, corporate sponsorships, drivers, race cars,
and pit crews. NASCAR competes with other entities that organize races for teams,
fans and television rights.

FN26. For economic analyses of the structure of NASCAR, see Peter von All-
men, Is the Reward System of NASCAR Efficient?, 2 J. Sports Econ. 62-79
(February 2001), and Craig A. Depken, II, and Dennis P. Wilson, The Effi-
ciency of the NASCAR Reward System, 5 J. Sports Econ. 371-86 (November
2004).

The significance of these facts is that NFL teams do not have only two options:
not to play at all or to play in the NFL. The claim that only through the NFL can
a member team produce a game poses a false dichotomy. The alternative to the NFL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

is not 32 free-standing teams, each of which has no one to play, but a variety of
other ways that teams could create rules and organize games, including an inde-
pendent entity that is not owned by teams but **\*27** that makes rules, hires game of-
ficials, and schedules a championship season for all teams, which is how most
sports leagues in the world are organized. [FN27]

> FN27. This option is extensively analyzed in several works by Stephen F.
> Ross and Stefan Szymanski, including Fans of the World Unite! A (Capitalist)
> Manifesto for Sports Consumers (2008), and Antitrust and Inefficient Joint
> Ventures: Why Sports Leagues Should Look More Like McDonald's and Less Like
> the United Nations, 16 Marq. Sports L.J. 213-60 (Spring 2006).

Although the NFL as it is currently structured may be an efficient way to organ-
ize professional football in the United States, this issue is not at stake in this
or any other antitrust litigation, now or in the past. Instead, the issue here is
whether efficient standardization by a league requires centralization of all core
business activities. The success of other leagues that are less centralized than
the current NFL and much less centralized than the NFL proposes that it should be
allowed to become demonstrates that centralization of all core **\*28** business activ-
ities is not essential for a successful league.

D. Sources of Value For NFL Teams

To the extent that Respondents claim that all of the economic value of major
league professional football in the United States is due solely to the existence
of the NFL, that claim is clearly false. The popularity of football creates a core
demand that immediately would be satisfied if, for some reason, the NFL joint ven-
ture were to disband, leaving 32 solitary teams without a league. These teams
would have several other options available: schedule games through a series of bi-
lateral negotiations, create a few new, smaller leagues (perhaps allowing teams in
different leagues to schedule some inter-league games), or contract with an entre-
preneur who sees a business opportunity in the absence of a tournament that leads
to the Super Bowl. Or the 32 teams could apply to join the new United Football
League, which begins play in the fall of 2009.

**\*29** These alternatives are neither implausible nor valueless. Thus, the NFL can
not possibly be responsible for the entire value of its member teams. The NFL also
can not plausibly claim responsibility for the entire value of the 12 NFL teams
that operated in other leagues before joining the NFL (St. Louis [then Cleveland
with a long layover in Los Angeles] of the second American Football League in the
mid-1930s; Baltimore [then Cleveland], Indianapolis [then Baltimore/New York], and
San Francisco of the All-American Football Conference of the late 1940s; and Bo-
ston, Buffalo, Denver, Kansas City, Nashville [then Houston], New York Jets, Oak-
land and San Diego of the fourth American Football League of the 1960s). [FN28]

> FN28. A chronology of team histories is included in James Quirk & Rodney D.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fort, Pay Dirt: The Business of Professional Team Sports 378-478 (1992). The
case of the Indianapolis Colts is complex. The Baltimore Colts, originally
an AAFC team, were merged into the NFL in 1950. In 1951, the principal owner
gave up the franchise to the NFL and sold the players to other teams. The
team was re-created to settle a lawsuit against the NFL by other stockhold-
ers, with the players coming from the Dallas Texans, which the league oper-
ated after it failed financially during the 1951 season. The Dallas Texans,
in turn, had been the New York Yankees of the AAFL.

**\*30** The value of a professional sports team is derived from the demand for games,
and the demand for games is determined primarily by the identities and qualities
of the teams, not the fact that the game is associated with the NFL brand name. If
NFL status accounted for all or nearly all of the demand for games, the identities
and qualities of teams would have little or no effect on attendance. Studies of
the demand for sports show that variation in attendance is explained primarily by
the characteristics of the city and stadium in which the game is played and the
quality of the teams (as measured by win-loss records) that are matched against
each other, while variation in television ratings is explained primarily by the
quality of the teams. [FN29] Cities differ in the degree to which team **\*31** reven-
ues depend on team quality, and these differences help to explain team relocation
decisions. [FN30] These features of the demand for games induce each team to seek
to improve its quality and generate competition in input markets.

FN29. For a comprehensive survey of economics research on the demand for
sports throughout the world, including major league and intercollegiate
sports in America, see Jeffrey Borland & Robert MacDonald, Demand for Sport,
19 Oxford Rev. Econ. Pol'y 478-502 (Winter 2003). For studies of the Nation-
al Football League, see Burhan Biner, Equal Strength or Dominant Teams:
Policy Analysis of NFL, (University of Minnesota Dept. of Econ., Working Pa-
per, March 2009); Craig A. Depken II, Fan Loyalty in Professional Sports: An
Extension to the National Football League, 2 J. Sports Econ. 275-84 (August
2001); Roger G. Noll, Attendance and Price Setting, in Roger G. Noll (ed.),
Government and the Sports Business (1974); Andrew M. Welki & Thomas J.
Zlatoper, U.S. Professional Football: Game Day Attendance in 1991, 15 Mana-
gerial & Decision Econ. 489-495 (Sept./Oct. 1994); Andrew M. Welki & Thomas
J. Zlatoper, U.S. Professional Football Game Day Attendance, 27 Atlantic
Econ. J. 285-298 (Sept. 1999).

FN30. Depken, supra note 29.

II. CENTRALIZATION OF SOME CORE BUSINESS ACTIVITIES HAS NO EFFICIENCY RATIONALE

Respondents seek an exemption from antitrust liability if they jointly acquire
key inputs (explicitly mentioning players and, by referencing team location, im-
plicitly indicating stadiums) and jointly sell their most important product
(broadcasting rights broadly defined to include more than **\*32** television). Re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

spondents have not yet explained the efficiency rationale for seeking this broad
exemption. The only efficiency argument that Respondents have offered is in con-
nection with the NFL's role as a standards organization (whereby the league cre-
ates "NFL Football"). The District Court and the Court of Appeals mention two oth-
ers: economies of scale from centralizing sales and enforcement of rights, and
promotion of competitive balance. Economics research supports the conclusion that
none of these efficiency claims applies to all core business activities of the
member teams of the NFL.

A. Rule of Reason Analysis of Product Licensing

 Very little economics research addresses product licensing, so we offer no con-
clusion as to whether the efficiency justification is valid in this case. Never-
theless, the issues that an economist would examine to address this issue are
straightforward. We set them forth to illustrate that the validity of the single-
entity defense hinges on the **33** same economic evidence that is necessary to un-
dertake a rule-of-reason analysis.

 The first step in an economic analysis of pooled licensing is to determine the
relevant market in which licensing takes place. For pooled licensing of team marks
and logos to be anticompetitive, the close substitutes for the marks and logos of
one team must be the marks and logos of teams in the same league, in which case
the relevant product market is product licenses for the marks and logos of NFL
teams.

 If the relevant product market is licenses for the marks and logos of NFL teams,
pooling of product licensing increases royalties and causes anticompetitive harm
in the form of higher prices and reduced output of licensed products. If economic
analysis shows anticompetitive harm from pooled licensing, the Defendant/Respond-
ent may be able to establish that pooling creates efficiencies that offset this
harm.

 **34** The claim that the NFL is a single entity in product licensing is based as-
serted efficiencies of joint licensing. If such efficiencies do not exist, a joint
venture for product licensing is a collusive cartel of horizontal competitors. If
the opinions of the District Court and the Court of Appeals reflect the evidence
and argument of the Respondents, the essence of the Respondents' efficiency claim
is that collective product licensing by NFL Properties has extensive economies of
scale that make licensing natural monopoly. [FN31] An economic analysis of the
product licensing market can determine whether this claim is true, and if so,
whether economies of scale are sufficiently important that they offset the **35** an-
ticompetitive harm, if any, from setting joint prices.

     FN31. Respondents and the other courts make reference to the quality of the
     marks and logos, implying that NFL Properties is necessary for assuring high
     quality. No explanation is provided for the implicit claim that competition

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

is bad for product design, which is obviously inconsistent with economics research on the role of competition in fostering innovation. In any event, there is no necessary connection between setting standards for the design of marks and logos, and reviewing them before they are used and licensed, and the subsequent activity of licensing them.

B. The Leap from Licensing To Other Business Activities

 For other collaborative activities, Respondents seek to leapfrog a rule-of-reason analysis because, they claim, the natural monopoly argument is valid for all other core business activities. The overall economic impact of integration in each core business activity depends on market and production conditions that are specific to the product in question. Consequently, there is no valid basis in economics to leap from a valid single-entity defense in product licensing, assuming it exists, to a general single-entity defense for any other collaborative activity that Respondents may decide to undertake.

 With respect to other activities, none of the efficiency rationales mentioned above are supported by economic analysis. For reasons discussed in the preceding section, the role of the NFL as a standards organization is separable from core business **\*36** activities of the teams. The economies of scale argument put forth as an efficiency justification for pooled product licensing is not clearly transferable to other business activities. The remaining issue requiring some discussion is the claim that business collaboration is necessary to maintain competitive balance.

C. Optimal Competitive Balance

 By far the most studied issue in sports economics is whether league policies that restrict competition among teams contribute to competitive balance. [FN32] The overwhelming consensus among **\*37** economists is that centralization of business decisions in professional team sports has not improved competitive balance and in some cases actually has reduced it, and that leagues nevertheless steadfastly substitute rules and commands for markets because doing so provides the anticompetitive benefits to member teams.

   FN32. Because the number of studies of competitive balance is so numerous, we list only some work. Additional references can be found in citations in the recent publications. The Journal of Sports Economics Vol. 3, No. 2 (May 2002) is entirely devoted to articles on competitive balance. Some other important contributions are Rodney Fort & James Quirk, Cross-Subsidization, Incentives and Outcomes in Professional Team Sports Leagues, 33 J. Econ. Literature 1265-99 (September 1995); James Quirk & Rodney D. Fort, Pay Dirt (2d ed. 1997), especially Chapter 7, Competitive Balance in Sports Leagues; Stefan Szymanski & Stefan Kesenne, Competitive Balance and Gate Revenue Sharing in Team Sports, 52 J. Indus. Econ. 165-177 (May 2004); E. Woodrow

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Eckard, Free Agency, Competitive Balance, and Diminishing Returns to Pennant
Contention, 39 Econ. Inquiry 430-443 (July 2001); Allen R. Sanderson & John
J. Siegfried, Thinking about Competitive Balance, 4 J. Sports Econ. 255-279
(November 2003); Roger G. Noll, The Economics of Baseball Contraction, 4 J.
Sports Econ. 367-388 (November 2003); Randall W. Bennett & John L. Fizel,
Telecast Deregulation and Competitive Balance, 54 Am. J. Econ. & Soc.
183-199 (April 1995); Rodney Fort, Competitive Balance in North American
Professional Sports, in Handbook of Sports Economics Research (John Fizel,
ed.) (2006); Paul Hadley, James Ciecka & Anthony C. Krautmann, Competitive
Balance in the Aftermath of the 1994 Players' Strike, 6 J. Sports Econ.
379-89 (November 2005); Young Hoon Lee, The Impact of Postseason Restructur-
ing on the Competitive Balance and Fan Demand in Major League Baseball, 10
J. Sports Econ. 219-235 (June 2009); Yang-Ming Chang & Shane Sanders, Pool
Revenue Sharing, Team Investments, and Competitive Balance in Professional
Sports: A Theoretical Analysis, 10 J. Sports Econ. 409-428 (August 2009);
and Rodney Fort & James Quirk, Optimal Competitive Balance in a Season Tick-
et League, Econ. Inquiry (forthcoming).

 As a useful concept for either economic analysis or business decision-making,
competitive balance is elusive. The term is used to capture the idea that uncer-
tainty of outcome contributes to the **38** demand for sports. Uncertainty of outcome
can refer to at least three different concepts: game uncertainty (whether a team
has a legitimate chance to win); single-season uncertainty (whether a team has a
reasonable chance to win the championship); and multi-season uncertainty (whether
a team that performs poorly in one season has a reasonable chance to perform well
in the next). In addition, measuring competitive balance also is elusive because
each of these types of outcome uncertainty can be measured in numerous ways. Ulti-
mately the best measures are those that come closest to capturing what fans care
about as potential consumers of sports products.

 Economics research on competitive balance addresses three related issues. The
first is the optimal degree of competitive balance. The second is whether the
facts confirm that competitive balance affects the demand for sports. The third is
whether competitive balance is affected by league policies, notably limits on com-
petition for players, sale of **39** pooled television rights, restrictions on team
relocation, revenue sharing, and the design of playing schedules.

 The extent of competitive balance is determined by the principal inputs to team
quality: players and coaches. The distribution of talent among teams is determined
by each team's business incentives: the prices of inputs and the responsiveness of
consumer demand to team quality. Leagues claim and many fans believe that leagues
can make competition more balanced by restricting the use of markets to allocate
talent (mainly players) and by engaging in extensive revenue sharing. The logic of
the argument is that in the absence of these policies, the wealthiest teams
(meaning teams that play in markets that generate substantially more revenue than
other markets) will buy all the talent. According to this logic, by restricting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

competition for inputs and sharing revenue more equally, leagues can prevent rich
teams from hiring all the players they want, thereby making competition more **40
balanced and improving the welfare of both consumers and the league as a whole. As
wonderfully logical as all this seems, economics research has convincingly demon-
strated that the argument is not correct.

For both a league and consumers, the optimal extent of competitive balance is not
for all teams to be of equal strength. Substantial revenue is derived from local
markets (tickets, concessions, local broadcasts), and local demand is not equally
responsive to improvements in quality in all cities. If all teams were equally
balanced, a league could increase its profits by moving some talent from markets
in which local revenues are less responsive to team quality to markets in which
revenues are more responsive.

The optimal competitive balance also is not for one team to become completely
dominant, but market allocation of inputs does not lead to dominance because the
law of diminishing returns applies to quality. The probability of winning can **41
not exceed unity, as an already strong team acquires better players and coaches,
the contribution of talent to the probability of winning must fall. At some point
a skilled player is more valuable on a weaker team than on a stronger one, so that
competitive imbalance among profit-seeking teams is self-limiting.

D. Competitive Balance and Layer Market Competition

The most important idea in the economics of sport is the invariance hypothesis,
which is a special case of the Coase Theorem. The invariance hypothesis states
that if teams are allowed to trade players, the system for allocating talent among
teams has no effect on competitive balance, assuming that transactions costs are
the same under free agency and league rules that limit competition among teams for
players but permit trades. Moreover, in a competitive player market, the value of
an increment to talent is the same for all teams, so **42 that the distribution of
players among teams is efficient.

Leagues have used several methods to limit competition for players. Examples are
assigning the right to contract with every player to a single team (such as the
old reserve clause) or setting a binding cap for player payroll in that every team
must spend less for players than they would if the player market were competitive.
For example, under the reserve clause, players entered the league through a draft
in which all talented players were divided equally among teams and each team had
perpetual exclusive rights to its pool of players. Players could not achieve free
agency unless they were released by the team that held their rights, which never
happened if the player was highly skilled. But the reserve clause did not prevent
trades of players and draft choices. Trades are just another form of market, and
if the trade market works as efficiently as the market for free agents, the dis-
tribution of team quality will be **43 unaffected by whether a league adopts free
agency or a player reservation system.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Due to differences in transactions costs, the player market and the trade market
may differ in their efficiency, in which case competitive balance can be affected
by rules of the player market. In the end empirical research must determine wheth-
er competitive balance is affected by a change in the structure of the player mar-
ket. Empirical research shows that the introduction of veteran free agency [FN33]
did not have an adverse effect on competitive **44 balance. The expressed fear of
leagues (including Respondents) in the 1970s and 1980s that free agency would un-
dermine competitive balance and cause a financial crisis among weaker teams has
proven to be unjustified.

> FN33. Reasonably unrestricted veteran free agency came to professional
> sports gradually, arising originally from the successful entry of competit-
> ive leagues which did not adhere to the player reservation systems of their
> competitors. In baseball, the key event was an arbitration decision in late
> 1975 ruling that baseball's reserve clause could not be enforced after a
> player "played out his option" by playing for one more year at the team's
> final salary offer without signing a contract. This decision led to a col-
> lective bargaining agreement that gave all veterans unrestricted free agency
> after six years and access to salary arbitration based on market value after
> three years. See Andrew Zimbalist, Baseball and Billions (1992), and Gerald
> Scully, The Business of Major League Baseball (1989). In all other sports,
> the key events bringing veteran free agency were successful antitrust litig-
> ation by players associations against the leagues. The last sport to adopt
> unrestricted veteran free agency was the NFL, after losing McNeil v. Dallas
> Cowboys Football Club, Ltd., 790 F. Supp. 871 (D. Minn. 1992).

E. Competitive Balance and Revenue Sharing

An important part of the analysis of competitive balance is the correct premise
that some teams in North American sports leagues are wealthier than others. The
primary cause of wealth differences among teams is differences in the size of mar-
kets. New York City is the largest metropolitan area in the United States, and it
has two NFL teams. The smallest NFL markets have one team, but are far less than
half as large as New York. The same general pattern applies in all major profes-
sional sports leagues in the U. S.

The reason that the number of teams in relation to market size is so variable is
that leagues have an explicit policy to protect their teams from **45 invasion of
their territory by a competitor. Thus, the leagues exacerbate whatever competitive
balance problem they have by placing too few teams in the largest markets.

Territorial rights for local teams are an American invention. A useful comparison
to the American system is the league structure of soccer in England. [FN34] Brit-
ish soccer teams have no territorial rights, and the teams in the Premier League
changes every year through "promotion and relegation," whereby the three worst
team in the Premier League are replaced by the three top teams in the Championship

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

League at the end of each season. As a result, England's largest market - London - typically has several Premier League teams. The number of local competitors that London Premier League teams face is determined strictly by the **46 success of oth-er London teams on the field and at the gate.

> FN34. Roger G. Noll, The Economics of Promotion and Relegation: The Case of English Football, 3 J. Sports Econ. 169-203 (May 2002); Stefan Szymanski & Tommasso M. Valletti, Promotion and Relegation in Sporting Contests, Revista de Politica Economica (May/June 2005), http://www.dsl.psu.edu/centers/sports_institute/articles/Szymanski%20Valletti%20promotion%20relegation.pdf.

The belief that revenue sharing and rights pooling would improve competitive bal-ance has no support in economics research. The fundamental insight arises from the theory of wage determination: workers are paid their "marginal revenue product," which means that the wage per unit of skill equals the incremental revenue created by the last unit of skill that was hired. If each team is allowed to keep on some fraction f of the revenues that its players generate, player salaries per unit of skill will fall to f times the marginal revenue product, and the distribution of playing talent will remain unchanged.

This argument works as long as f is large enough to give a team an incentive to hire skilled athletes, but if f becomes too large, a team's profit-maximizing strategy can switch to living off shared revenue and spending as little as pos-sible on players, **47 in which case competitive balance can become worse. [FN35]

> FN35. Revenue sharing can cause competitive balance to become worse for oth-er reasons as well, as discussed in Szymanski & Kesenne, supra note 32; Noll, Baseball Contraction, supra note 32; and Andrew Zimbalist, May the Best Team Win: Baseball Economics and Public Policy (2003).

This line of analysis has been applied to study the impact of the collective sale of broadcast rights. [FN36] This research focuses on Europe because different na-tions have adopted different competition policies regarding the pooling of rights, allowing comparisons both across nations and in the same nation over time. [FN37] This research shows that rights pooling **48 generally has either no effect or makes matters worse.

> FN36. Sonia Falconieri, Josef Sakovics & Frederic Palomino, Collective Versus Individual Sale of Television Rights in League Sports, 2 J. Eur. Econ. Ass'n. 833-962 (September 2005); Roger G. Noll, Broadcasting and Team Sports, 54 Scot. J. Pol. Econ. 400-421 (July 2007); Stefan Kesenne, The Im-pact of Pooling and Sharing Broadcast Rights in Professional Team Sports, 4 Int'l J. Sport Fin. 211-18 (Aug. 2009); Thomas Peeters, Competitive Balance and Broadcasting Rights in European Football (Faculty of Applied Econ. Work-ing Paper, 2009); David Forrest, Rob Simmons & Stefan Szymanski, Broadcast-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing, Attendance and the Inefficiency of Cartels, 24 Rev. Indus. Org. 243-265 (May 2004).

FN37. In the United States such comparisons are not meaningful because all leagues have been affected by the Sports Broadcasting Act, which allowed leagues to pool the sale of television rights beginning in 1962, before television was the primary source of income for sports leagues.

F. Anticompetitive Effects of Pooled Television Rights

Given that revenue sharing and rights pooling can reduce the overall demand for a sport, the remaining question is why leagues nevertheless favor rights pooling. The answer is that it increases profits by raising revenues and reducing costs. Theoretically, pooling increases revenues from television rights if the relevant market for broadcast rights includes teams in a single sport, but not teams in other sports or other forms of entertainment. And theoretically pooling reduces costs by reducing the marginal revenue product of a player to a team, as described above.

Empirically, the first effect has been documented by empirical research. One natural experiment occurred when Congress passed an **49** antitrust exemption for professional sports leagues to engage in the collective sale of national over-the-air television rights. [FN38] The Sports Broadcasting Act led to greater television revenues among professional sports leagues but to fewer televised games. [FN39] Likewise, the successful antitrust litigation against the collective sale of national college television rights by the National Collegiate Athletic Association caused a substantial increase in the number of college games that were televised. [FN40]

FN38. The litigation cited by Respondents, **Shaw v. National Football League, 172 F.3d 299 (3d Cir. 1999)**, challenged the collective sale of television rights for pay-TV distributed by satellite and cable system.

FN39. Ira Horowitz, Sports Broadcasting in Government and the Sports Business (1974).

FN40. Bennett & Fizel, supra note 32.

CONCLUSION

Our primary conclusion is that there is no basis in economics for deciding that the NFL should be regarded as a single entity for any business activity of member teams that it decides to centralize. The single entity concept is useful when **50** applied to the divisions of a corporation because corporations are not joint ventures of independent firms that are or can be horizontal competitors. Two economists, who once consulted for Respondents, concluded that sports leagues can be analyzed as single entities when "there is no relevant competition among the member teams in the absence of the league." [FN41] In short, the most useful way to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

view sports leagues is as a joint venture among entities that in some respects are horizontal competitors, but in other respects are not. In areas where they are not competitors, treatment as a single entity is not harmful because their collaboration has no anticompetitive effect. In other cases, a rule-of-reason analysis allows comprehensive balancing of the anticompetitive effects and the efficiency benefits of collaboration. In these circumstances, the **\*51** designation of a league as a single entity should occur only after complete consideration of the relevant evidence.

> FN41. Michael A. Flynn & Richard J. Gilbert, The Analysis of Professional Sports Leagues as Joint Ventures, 111 The Econ. J. F27-F46 (February 2001). We disagree with them that the location of franchises is among the matters on which teams, in the absence of a league, would compete because only league rules prevent teams from relocating in the territories of other teams.

U.S.,2009.
American Needle, Inc. v. National Football League
2009 WL 3090453
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.