UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: PLASMA-DERIVATIVE PROTEIN | ) | |
| THERAPIES ANITRUST LITIGATION | ) | Case No. 09 C 7666 |
| | ) | |
| | ) | MDL No. 2109 |
| | ) | |
| THIS ORDER RELATES TO ALL ACTIONS | ) | Judge Joan B. Gottschall |
| | ) | |

# **MEMORANDUM OPINION & ORDER**

The United States Judicial Panel on Multidistrict Litigation ordered the consolidation of these actions pursuant to 28 U.S.C. § 1407 for the purpose of supervising pretrial proceedings. (Doc. 1.) This MDL now consists of seventeen class actions brought on behalf of purchasers of plasma-derivative protein therapies against defendants CSL Limited, CSL Behring LLC, CSL Plasma (collectively, "CSL"), Baxter International Inc. ("Baxter"), and Plasma Protein Therapeutics Association ("PPTA"). Plaintiffs allege that CSL and Baxter, the two largest domestic producers of plasma-derivative therapies, conspired along with PPTA, a trade association, to restrict supplies of the therapies, thus keeping prices high, in violation of the Sherman Act, 15 U.S.C. § 1. The court appointed a plaintiffs' steering committee to conduct and coordinate the discovery stage of litigation, and, on June 4, 2010, plaintiffs filed a Consolidated Amended Complaint ("CAC"). (Doc. 222.) All defendants have moved to dismiss for failure to state a claim under the standard in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). (Doc. 265.) PPTA has filed a separate motion arguing additional grounds for dismissal (Doc. 255), and CSL Limited seeks dismissal based on a lack of personal jurisdiction (Doc. 261).

# I. BACKGROUND

CSL and Baxter are the largest of only five producers of plasma-derivative protein therapies in the United States. (CAC ¶¶ 88, 219.) Plasma therapies are used by hospitals and other healthcare providers in the treatment of certain "serious illnesses including immune deficiency diseases, coagulation disorders, and respiratory diseases." (*Id*. ¶¶ 2, 50.) Plaintiffs allege that a series of significant changes in the market for plasma therapy products led to the formation of the conspiracy between CSL, Baxter, and PPTA beginning at least as early as July 1, 2003 and continuing to the present. During that period, prices of plasma therapies "have risen dramatically," and "Defendants have enjoyed large profit margins." (*Id*. ¶ 27.)

The lawsuits in this case were triggered by a Federal Trade Commission ("FTC") complaint that was filed in the United States District Court for the District of Columbia seeking to block a planned merger between CSL and one of its competitors. *See FTC v. CSL Ltd. et al.*, 09-cv-1000, Doc. 54 (D.D.C. Nov. 11, 2009). The FTC's complaint contained many of the same facts as the CAC and suggested that the planned merger would further consolidate an already highly concentrated market. CSL eventually called off the merger, and the FTC dismissed its complaint. However, plaintiffs seized on the FTC's complaint, and they now allege that the merger was part of the broader conspiracy to ensure high prices and profits in the plasma therapies market. For the purposes of this motion, the court takes as true the following facts alleged in the CAC.[1]

---

[1] The court will summarize only the most significant allegations because the complaint fills nearly eighty pages. One of the side effects of the Supreme Court's decision in *Twombly* is that antitrust complaints have grown in volume as plaintiffs attempt to provide enough factual detail to survive a motion to dismiss. Herbert Hovenkamp, *The Pleading Problem in Antitrust Cases and Beyond*, 95 Iowa L. Rev. Bulletin 55, 56-57 (2010) ("*Twombly*'s approach leads to a great deal of confusion and—in antitrust at least—has produced prolix complaints sometimes running to more than one-hundred pages."). However, it is important to recognize that *Twombly* does not call for detailed factual allegations. It only requires enough facts to show that an alleged conspiracy is plausible. 550 U.S. at 555.

A.      **Characteristics of the Plasma Therapies Market**

The manufacturing process for plasma therapies is a multi-step process that can take up to a year to complete. First, the blood plasma must be collected from donors. Then the plasma must be tested, and the proteins are separated out in a process called "fractionation." Finally, the proteins are finished and checked for quality. (CAC ¶ 48.) The manufacture of plasma therapies is tightly regulated by the United States Food and Drug Administration ("FDA") and state regulators. (*Id.* ¶ 49.) Facilities for collection and processing of blood plasma must be approved by the FDA, and the approval process can take more than two years to complete. (*Id.* ¶¶ 59-60.) Because plasma therapies are subject to FDA approval processes, only plasma collected and processed domestically can be sold in the United States. (*Id.* ¶ 59.)

Plasma therapies can be very expensive. Annual cost for treatment can exceed $90,000 per patient. But the therapies are life-saving, and no adequate substitutes exist. (*Id.* ¶¶ 50-51, 55, 58, 216-17.) Plasma therapies are a commodity-like product with no significant differences among suppliers. (*Id.* ¶¶ 213-14.) The CAC focuses on two of the "most prominent" plasma therapies, immune globulin ("Ig") and albumin. (*Id.* ¶ 52.) Ig is prescribed to treat a wide variety of diseases. (*Id.* ¶ 53.) Albumin is used primarily in surgical and trauma settings "to expand blood volume and to prime heart valves during surgery." (*Id.* ¶¶ 56-57.)

B.      **Pre-Conspiracy Developments**

Although the plaintiffs allege that the conspiracy began in 2003, the CAC lays out some of the important history of the plasma therapies industry. Following a recall of albumin in 1997, the FDA closed a plant located in Kankakee, Illinois.[2] In 1999, a plant in California also closed

---

[2] At the time, the plant was owned by a company called Centeon. Today, it is owned by CSL Behring. (CAC ¶ 62.)

temporarily.³ The closure of these two facilities spurred a national shortage of plasma therapies. (*Id.* ¶ 62.) Concern over the health implications of these developments led to national media coverage, congressional hearings, and increased FDA regulation. (*Id.* ¶¶ 63-64.)

As part of its response to the crisis, the FDA established a requirement for manufacturers to monitor distribution levels of plasma therapies and to report on those levels twice per year. (*Id.* ¶ 65.) The International Plasma Products Industry Association ("IPPIA"), a predecessor to PPTA, organized the industry to take voluntary action, beyond that required by the FDA. Manufacturers promised to make monthly reports about both distribution and inventory of plasma therapies. (*Id.* ¶ 66.)

After the closed plants came back on line, the industry was faced with a reversal of market conditions. Between 2000 and 2003, there was an overabundant supply of plasma therapies. Prices dropped, and producers experienced "a 30% reduction in gross operating margins." (*Id.* ¶ 79.) At the same time, the industry trade association, now known as PPTA after IPPIA merged with another trade group, launched a new program in September 2002 "to monitor total industry output" and "to warn industry participants when inventory levels of Plasma-Derivative Protein Therapies reached certain levels." (*Id.* ¶ 85.)

**C.   Consolidation of Plasma Therapies Industry**

The efforts at greater industry coordination on monitoring of supply coincided with a period of consolidation among producers. The industry shrunk from thirteen domestic producers in 1990, to nine in 2003, and down to only five by 2005. (*Id.* ¶ 88.) Today, CSL and Baxter together control approximately 60% of the market for plasma therapies. The rest of the market is divided among three other competitors: Talecris Biotherapeutics Holdings Corporation

---

³   At the time, the plant was owned by Alpha Therapeutic Corporation, and it is now owned by Baxter. (CAC ¶ 62.)

("Talecris") which controls 23% of the market, Grifols USA ("Grifols") which controls 7%, and Octapharma USA, Inc. ("Octapharma") which controls 5%. (*Id.* ¶ 219.) With respect to Ig and albumin, CSL and Baxter control even larger market shares. (*Id.* ¶¶ 219-21.)

The industry also transformed itself in the direction of more vertical integration. (*Id.* ¶¶ 88-97.) The vast majority of plasma collection centers were privately owned in 2000, but, over the next few years, Baxter, CSL, and other plasma therapy producers acquired many of the independent plasma collectors and facilities. By 2008, 80% of the plasma collection centers were owned by the five producers. (*Id.* ¶ 942.) The changes in the industry have left CSL, Baxter, and Talecris as the major competitors. Grifols and Octapharma remain small and without the capacity for significant expansion. (*Id.* ¶ 90.)

**D.  Conspiracy to Limit Supply of Plasma Therapies**

As the plasma therapies industry consolidated, defendants continued to cut supplies, even as demand was increasing. (*Id.* ¶ 98.) This business strategy led to increases in price and a shortage of therapies, causing patients to suffer and, in some cases, die. (*Id.* ¶¶ 98, 157-71.) Plaintiffs point to a series of production cuts, strategic acquisitions, and plant closures by CSL and Baxter leading to reduced supply. In July 2003, Baxter announced plans to reduce its annual plasma production by 600,000 liters and to close twenty-six plasma collection centers and a Michigan fractionation facility. (*Id.* ¶ 105.) Then in April 2004, after acquiring rival Aventis Behring, CSL announced its own plans to reduce plasma production at one of the newly acquired plants. (*Id.* ¶ 107.) Around the same time, Baxter announced an additional reduction in annual plasma production of about 400,000 liters. (*Id.* ¶ 111.) In November 2004, Baxter's CFO John Greisch made note of the fact that CSL had reduced its plasma production by about 1 million liters, approximately the same total amount of reduction as Baxter. (*Id.* ¶ 142.) And in 2005,

5

Baxter closed some of the plasma collection facilities that it had acquired from the American Red Cross. (*Id*. ¶ 111.) From 2005 until the present, plaintiffs allege that CSL and Baxter have maintained a strategy of slow growth to keep supplies low and prices high. (*Id.* ¶¶ 147-50.)

CSL and Baxter regularly met to discuss the pricing and supply of plasma therapies. Executives from both competitors were involved in managing PPTA, and trade association meetings served as the venue for the defendants to confer about business strategy. (*Id.* ¶¶ 115-16.) The minutes of official meetings were "scrubbed" to eliminate incriminating information, and executives also met after the official conferences "at bars for drinks or at restaurants for dinner away from the watchful eyes of association attorneys and other outsiders, and continued to discuss supply levels and pricing in furtherance of the conspiracy." (*Id.* ¶¶ 128, 130.)

In order to police the conspiracy, plaintiffs allege that defendants relied on the data collected by PPTA regarding supply and inventory. (*Id.* ¶¶ 182-84.) And plaintiffs contend that executives of CSL and Baxter engaged in a system of "signaling" through public statements, in order to assure one another that each competitor was maintaining its end of the arrangement. (*Id.* ¶¶ 136-52.) Plaintiffs point to a number of statements made during investor calls, at industry conferences, or in other public fora that demonstrate that CSL and Baxter planned to stick to a strategy of keeping supplies low. (*Id.*)

Defendants attempted to hide the conspiracy by falsely reporting supply data to the government and denying the existence of shortages in the market. They hoped to avoid another government investigation similar to the one which led to intense scrutiny and regulation in the late 1990's. (*Id.* ¶¶ 172-81.)

When defendants feared expansion by Talecris, an increasingly major player in the plasma therapies market, CSL offered to purchase Talecris at a premium price. Baxter expressed

its strong support for the proposed merger. (*Id.* ¶¶ 192-93.) The deal fell apart, however, when the FTC filed suit.[4]

## II. ANALYSIS

### A. *Twombly* Motion

Section 1 of the Sherman Act prohibits any "contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The provision reaches only conduct which results from an agreement among firms and not independent action which happens to have an anti-competitive effect. *Twombly*, 550 U.S. at 553-54; *In re Text Messaging Antitrust Litig.*, --- F.3d---, 2010 WL 5367383, at *4 (7th Cir. 2010). Defendants contend that the factual allegations in the complaint do not plausibly suggest such an agreement. Thus defendants move to dismiss the complaint for failure to meet the pleading standard articulated in *Twombly*.

#### 1. *Twombly* Standard

The Supreme Court, in *Twombly*, held that a plaintiff alleging a § 1 conspiracy must draft a complaint which includes "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. The defendants in *Twombly* were the nation's regional telephone operators. The 1984 break up of American Telephone & Telegraph Company led to the creation of regional monopolies for local telephone service, known as Incumbent Local Exchange Carriers ("ILECs"). But the Telecommunications Act of 1996 sought to inject competition into the local service market by requiring ILECs to open their networks to competitors and by permitting ILECs to offer service throughout the country. The complaint made two primary factual allegations: (1) that the ILECs had each simultaneously acted to block new competitors in

---

[4] An FTC press release from the time of the lawsuit stated that plasma therapies markets "are already exhibiting troubling signs of coordinated behavior." And, according to plaintiffs' complaint, "The FTC has recognized that some of the language from the files of CSL and Baxter would cause them 'embarrassment' and 'could expose [CSL] to possible treble damages actions.'" (*Id.* ¶¶ 205, 210.)

their respective regions, and (2) that the ILECs refrained from competing in each others' regions. The complaint asserted that this parallel conduct resulted from a conspiracy among the ILECs. *Id.* at 549-51.

The Court held that conclusory assertions of conspiracy plus descriptions of parallel behavior are not sufficient to state a claim under § 1 of the Sherman Act where the alleged facts do not suggest that the defendants were acting pursuant to an agreement. Firms within a single industry often act in similar ways even though no coordination has taken place. *Id.* at 554. The parallel behavior could simply be a uniform response to a common stimulus. To borrow an example used by the Seventh Circuit, the simultaneous establishment of thousands of lemonade stands on a hot summer day does not suggest the existence of an agreement among all enterprising children. *Text Messaging*, 2010 WL 5367383, at *4. Similarly, the fact that the ILECs set up roadblocks to the entry of competitors in their regions does not suggest conspiracy. Each individual firm had an incentive to thwart competitors and would have been expected to act accordingly regardless of how the other ILECs behaved. *Twombly*, 550 U.S. at 566.

In a concentrated market, parallel conduct also may result from interdependent behavior, so-called "conscious parallelism." Firms observe or anticipate their competitors' pricing decisions and take that behavior into account in making business decisions.[5] The price of airline tickets is often consistent across competitors, but, from that fact alone, one cannot assume collusion. The airlines could achieve uniformity by observing competitors' rates, which are readily available, and then quickly moving to match prices. The failure of the ILECs in *Twombly*

---

[5] In a perfectly competitive market with many sellers, the fact that one competitor reduces its price will have only a tiny effect on the profits of the other competitors because each seller controls only a fraction of the supply. The other competitors will not be forced to change their own pricing in response. In a concentrated market, however, each firm controls a significant share of the supply, and a price cut by one firm could significantly cut into the market share of other competitors. The other firms in the industry will have a strong incentive to match any price cut. Thus the firms in the concentrated market are said to be interdependent. Richard A. Posner, Antitrust Law 56 (2d ed. 2001).

to enter each other's regions can also be explained as interdependent behavior. Even though each firm was capable of competing in other regions, "a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 568. Parallel behavior, like that alleged in *Twombly*, cannot alone support a conspiracy claim because some additional fact must be pled which allows an inference of agreement to be drawn.

The Court in *Twombly* contrasted the standard to be applied in assessing a complaint at the motion to dismiss stage with the standard applied in evaluating a complete record later on in the litigation. In the context of a motion for summary judgment or for a directed verdict, a plaintiff asserting a § 1 claim must also show more than parallel behavior. However, the evidence "must tend to rule out the possibility that the defendants were acting independently." *Id.* at 554 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). Of course, any direct evidence of agreement—such as an admission by an insider—will permit a plaintiff to survive summary judgment. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002). More often, plaintiffs must rely on circumstantial evidence to demonstrate that the observed behavior resulted from a meeting of the minds rather than independent decisions.

A court faced with a dispositive motion will examine the evidence as follows. First, the court will look for evidence of interdependence or, put another way, that the defendants have an economic motive to behave in concert. *Matsushita*, 475 U.S. at 596-97. Second, the court looks to all the evidence suggesting agreement, or "plus factors," which can be in the form of economic or non-economic evidence. *In re High Fructose Corn Syrup*, 295 F.3d at 655; *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999). The court then examines the

competing explanations for the evidence offered by the plaintiffs and defendants. If the inference of an agreement seems equally likely to be true as the inference that no agreement exists, then the plaintiff cannot defeat a motion for summary judgment. *Matsushita*, 475 U.S. at 596-97 ("[I]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 49 (7th Cir. 1992).

The court engages in a similar analysis in evaluating an antitrust claim at the motion to dismiss stage. The court looks at all the facts pled in the complaint—focusing on any factual allegations suggesting interdependence and the existence of an agreement—and compares the competing explanations offered by plaintiffs and defendants. *See Twombly*, 550 U.S. at 567-68 (stating that an inference that ILEC's conspired to divide the market for phone service was implausible in light of the obvious alternative explanation and lack of any factual allegations suggesting agreement). But *Twombly* identified a much less onerous standard to be applied at the motion to dismiss stage. *Twombly* does not require that the inferences supporting the plaintiffs' explanation be stronger than those supporting the defendants' explanation. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556; *see also Text Messaging*, 2010 WL 5367383 at *6 ("[T]he complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connote."). The inference that plaintiffs ask the court to draw from the factual allegations need only be "plausible" in light of alternative lawful explanations for the conduct.

The Court did not establish a heightened pleading requirement for antitrust cases. *Twombly*, 550 U.S. at 569 n.14. Rule 8 applies in this context, and it requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The well-pled facts of the complaint must be taken as true and construed in the light most favorable to plaintiffs; all possible inferences should be drawn in the plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

2. Application of *Twombly* Standard to Plaintiffs' Complaint

Defendants argue that the complaint in this case suffers from the same deficiencies as the complaint in *Twombly*. They contend that plaintiffs have failed adequately to allege any parallel conduct by CSL and Baxter demonstrating interdependence; that plaintiffs have not alleged any "plus factors" which tend to show that defendants acted pursuant to an agreement; and that the alleged conspiracy is not plausible in light of the competing explanation that defendants were merely acting according to their independent self-interest.[6]

According to defendants, "only parallel conduct that would be inexplicable absent an agreement supports an inference of a conspiracy under *Twombly*." (Defs.' Mem. in Support of Mot. to Dismiss at 10.) Defendants point to two recent cases in this judicial district where antitrust plaintiffs alleged that multiple firms had undertaken dramatic and near-simultaneous supply cuts. In *Standard Iron Works v. ArcelorMittal*, plaintiffs alleged "concerted and unprecedented production curtailments that occurred on the heels of" industry meetings. 639 F. Supp. 2d 877, 897 (N.D. Ill. 2009). And, similarly, in *In re Potash Antitrust Litigation*, plaintiffs

---

[6] The court follows the parties' lead in focusing on whether plaintiffs have adequately pled circumstantial evidence of a conspiracy. The plaintiffs suggest that the complaint also contains allegations of direct communications between defendants, which distinguishes the allegations from those in *Twombly*, which alleged conspiracy only in a conclusory manner. (Pls.' Resp. to Defs.' Mot. at 15 n.16.) But the argument appears only in a footnote and is not well developed.

11

alleged that defendants had slashed production and shut down a number of mines "shortly following" industry meetings. 667 F. Supp. 2d 907, 935 (N.D. Ill. 2009).

The allegations in *Standard Iron Works* and *Potash* contrast with this case in that CSL and Baxter allegedly reduced their capacity over a much longer period of time. Both CSL and Baxter are alleged to have cut production by 1 million liters and to have done so over the course of a year. The closure of plasma collection and production facilities occurred gradually, as the firms were acquiring competitors. In subsequent years, as shortages of these products caused a public health crisis, Baxter and CSL continued to pursue a strategy of growing supplies slowly.

The supply cutbacks alleged in *Standard Iron Works* and *Potash* gave rise to an inference that the defendants in those cases were coordinating because the reductions were dramatic, nearly simultaneous, and closely following communications among competitors.[7] The supply cutbacks in this case are alleged to have occurred more gradually and thus could have resulted from one firm observing its competitor's decisions and then independently deciding to follow along.[8] But *Twombly* does not require that a complaint include allegations of such an unnatural coincidence in the management of competitors' businesses. It would be difficult for a court to conclude that a conspiracy had been plausibly alleged without facts demonstrating "that the defendants had a motive to conspire or, which is the same thing, that their behavior is

---

[7] Similarly, in *Twombly*, the Court noted that an inference of conspiracy could be drawn from allegations of "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason." 550 U.S. at 556 n.4. The Court cited to an influential treatise which terms this type of behavior "incredible simultaneous parallelism." 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1425c (3d ed. 2010). The paradigmatic example of simultaneous parallelism given by the treatise is of two firms making identical secret bids on some non-standardized product. Without previous coordination, such a coincidence would seem to be totally improbable. *Id.* at 185. The Seventh Circuit recently affirmed another decision from this judicial district denying a motion to dismiss where it was alleged that "[t]he change in the industry's pricing structure was so rapid . . . that it could not have been accomplished without agreement on the details of the new structure, the timing of its adoption, and the specific uniform price increase that would ensue on its adoption." *Text Messaging*, 2010 WL 5367383, at *5.

[8] The conduct by Baxter and CSL would be described as "sequential parallelism" because each firm would have had time to observe and evaluate its competitor's actions before making its own production decisions. 6 Areeda & Hovenkamp ¶ 1425d, at 188.

interdependent." 6 Areeda & Hovenkamp ¶ 1425b, at 184. But interdependence can be inferred from parallel conduct that is sequential rather than simultaneous. *Id.* ¶ 1425d. The complaint in this case plausibly alleges interdependence because, despite rising demand, defendants allegedly reduced their production capacity in order to keep profits high. In a perfectly competitive market, supply reductions by one firm would presumably lead to other competitors filling in the gaps and prices remaining lower. But in a concentrated market, like the one for plasma therapies, CSL and Baxter have a motive to avoid undercutting one another on price. Of course, as stated earlier, interdependence alone does not suggest a conspiracy, but the complaint may rely on other "plus factors" in order to suggest that consciously parallel behavior is the result of an illegal agreement.

Plaintiffs point to a number of factual allegations which, they argue, support an inference that the parallel conduct in this case resulted from an agreement between CSL and Baxter. Plaintiffs focus on five categories as critical "plus factors" in this case: (1) defendants allegedly took actions "which would have been against their independent economic self-interest, (2) defendants made public statements about supply strategy which were intended as "signals" to competitors that the conspiracy was proceeding, (3) defendants conducted private meetings to discuss price and supply of plasma therapies, (4) defendants submitted false reports to the government about plasma supplies in order to hide the conspiracy, and (5) the structure of the plasma therapies market is conducive to agreement. Looking at all the factual allegations in the complaint, the court concludes that plaintiffs have plausibly alleged a conspiracy.

Some of plaintiffs' suggested "plus factors" are less convincing than others. For example, many of the public statements, which plaintiffs contend are part of a "signaling" strategy meant to keep the conspiracy going, are very general statements to investors or

13

regulators about the trajectory of the plasma therapies industry. (*See, e.g.,* Compl. ¶¶ 146 (statement by Baxter CFO at industry conference that company is "in a very good position to see stable growth in this business going forward over the next three to five years"), 147 (statement by CSL Limited CEO that, "What we see now is, I think, the industry now heading to a much more predictable phase of stability . . . .").) It is difficult to imagine how these generic statements render the conspiracy allegation more plausible. Other allegations, such as the fact that CSL and Baxter executives gathered during PPTA meetings and afterward at bars and restaurants to discuss pricing and supply, might not, on their own, be particularly suggestive. However, the Seventh Circuit acknowledged in *Text Messaging* that such behavior can "facilitate" coordination "that would be difficult for the authorities to detect." 2010 WL 5367383, at *5.

It is also critical to repeat that an allegation that firms raise price or decrease supply at a time when demand is increasing would not necessarily suggest the firms are acting pursuant to an agreement. Such behavior need not be, as plaintiffs argue, contrary to independent self-interest. *Baby Food*, 166 F.3d at 122 ("The concept of 'action against self-interest' is ambiguous and one of its meanings could merely constitute a restatement of interdependence."). Interdependent firms know that their competitors have an incentive to match price, and an attempt to gain market share by selling low may simply lead to a price war. But the structure of an industry can suggest whether observed parallel behavior is likely to be the result of agreement or mere interdependence. *Text Messaging*, 2010 WL 5367383, at *4 ("[A]n industry structure that facilitates collusion constitutes supporting evidence of collusion."). Where prices or supplies can be quickly adjusted (as in the airline example above), firms face little risk in waiting to see how competitors price their products.

14

In this case, plaintiffs have alleged that expanding supply of plasma therapies must be planned well in advance because plasma therapies require months to manufacture. And expanding production capacity requires approval of regulators and potentially years of waiting. Despite these constraints, CSL and Baxter made decisions to cut back production and reduce capacity. These business decisions would be impossible to reverse quickly. As demand increased, the defendants would have been left without the ability to bring supply in line with orders. This sort of parallel behavior has been described as "perilous leading" because, absent an agreement, the first firm to move takes a significant risk that competitors won't follow. 6 Areeda & Hovenkamp ¶ 1425d; *see also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 463 (9th Cir. 1990) ("The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely."). If Baxter had cut its production, but CSL refused to follow, Baxter might not have realized its error until months later when CSL would have the ability to capture a greater share of the market. Or if Baxter closed plasma collection facilities, but CSL had not behaved similarly, Baxter might have found itself forced to make new, expensive investments or face the prospect of losing its ability to compete.

In addition, the other allegations of the complaint show that the plasma therapeutics industry was ripe for collusion[9] and that defendants had ample opportunity to carry out their scheme. The industry was highly consolidated, with only a handful of firms, making coordination easier. The product, plasma therapies, is uniform across manufacturers, and the demand for the product is highly inelastic because there are no good substitutes. Fixed costs in

---

[9] In his treatise on antitrust law, Judge Richard Posner lays out a number of factors on which enforcers of the law should focus in seeking out industries where collusion is likely to occur. Among others, he lists the following factors which are relevant in this case: (1) a market concentrated on the selling side and unconcentrated on the buying side, (2) inelastic demand at the competitive price, (3) entry into the market takes a long time, (4) standardized product, and (5) high ratio of fixed to variable costs. Posner, *supra*, at 69-79.

15

the industry are high, and the big players are vertically integrated. As a result, new or smaller competitors have very limited ability to increase market share. Plaintiffs also allege that defendants met furtively during and after industry meetings to discuss price and supply, and PPTA worked with defendants to create a system for monitoring production in the industry. Thus, defendants had the opportunity to meet and monitor the ongoing agreement.

Defendants make a somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with the firms' independent self-interest. After the supply of plasma therapies expanded early in the decade, leading to steep declines in profitability, CSL and Baxter naturally had an incentive to reduce capacity and then pursue a strategy of measured growth. CSL and Baxter also had to contend with Talecris, a competitor who, according to the complaint, was expanding aggressively and already controlled a significant share of the market. But despite any doubts about plaintiffs' case, the defendants propose a standard for reviewing the complaint which does not comport with *Twombly* or Rule 8. It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants. That is the standard appropriate for a summary judgment motion. Here, the plaintiffs need only allege a conspiracy which is plausible in light of the competing explanations.[10] The complaint in this case meets that lower standard. The defendants' motion is denied.

**B.     PPTA's Motion to Dismiss**

PPTA moves separately to dismiss arguing that, as a trade association and not a market participant, the complaint cannot state a claim against it. PPTA makes a number of contentions:

---

[10] The *Twombly* Court expressed its concern that antitrust discovery could be expensive and that plaintiffs who put forth implausible allegations should not be permitted to abuse the system. 550 U.S. at 546. But the Supreme Court has also recognized that Congress drafted the antitrust laws with the express purpose of encouraging private enforcement. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979). If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data.

16

that trade association activities are presumptively lawful and that its activities are protected by the *Noerr-Pennington* doctrine and the doctrine of implied repeal.

In light of the court's disposition of the *Twombly* motion, PPTA's motion is easily dispatched without delving much into its legal arguments. The court has already concluded that plaintiffs have alleged a plausible conspiracy. The court must also accept as true the well pled allegations that PPTA helped defendants conceal the conspiracy by falsely denying the existence of supply shortages and over-reporting the actual supply to government officials. (Compl. ¶ 173 ("Defendants, via the PPTA, falsely denied and concealed supply shortages and significantly over-reported the actual supply of Plasma-Derivative Protein Therapies in the industry . . . .").) Given this allegation, the court cannot see how it can avoid the conclusion that plaintiffs have adequately pled PPTA's participation in the conspiracy.

PPTA makes two unconvincing arguments to defeat this allegation. First, PPTA contends that plaintiffs have alleged only that the deception was perpetrated "via" PPTA, rather than "by" PPTA, thus demonstrating that PPTA was not responsible for the falsified supply numbers. However, in considering a motion to dismiss, the court must make all inferences in favor of plaintiffs, and the court declines to give the allegation the narrow reading urged by PPTA. Second, PPTA cites *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991), for the proposition that a deception used in the course of lobbying a legislative body is protected from antitrust liability by *Noerr-Pennington*. However, that doctrine protects the First Amendment rights of individuals who lobby the government for legislation or regulation which would have an anticompetitive effect. *Id.* at 379-80. PPTA is not alleged to have sought anticompetitive regulation; rather, it is accused of assisting the other defendants in concealing their unlawful activities.

17

All the other allegations that PPTA vigorously contests are irrelevant at this stage of the litigation. Plaintiffs have plausibly alleged an antitrust conspiracy and that PPTA participated in effectuating the conspiracy. PPTA's motion to dismiss is denied.

**C.      CSL Limited's Motion to Dismiss for Lack of Personal Jurisdiction**

CSL Limited's motion to dismiss for lack of personal jurisdiction may also be quickly disposed of. CSL Limited is an Australian company and the parent of CSL Behring and CSL Plasma Inc. According to the motion and an attached affidavit, CSL's plasma therapies business in the United States is conducted entirely by the two subsidiaries, and CSL Limited should be dismissed from the action.

The parties agree that the relevant forum in this case is the entire United States, rather than just the State of Illinois. Plaintiffs bear the burden of making a prima facie showing that jurisdiction is appropriate. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). "[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783. A court may exercise in personam jurisdiction over a nonresident corporate defendant when the plaintiff can establish either general or specific jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). General jurisdiction requires that the corporation's contacts with the forum be "continuous and systematic." *Id.* at 416. Specific jurisdiction requires that plaintiffs' injuries "arise out of or relate to" activities by the defendant which are "purposefully directed" at the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Plaintiffs argue that the allegations of the complaint demonstrate that CSL Limited's contacts with the United States permit the exercise of jurisdiction under either theory.

The court need not address all the parties' arguments because it appears that the exercise of specific jurisdiction over CSL Limited is appropriate in this case. Plaintiffs allege that CSL Limited acquired rival Aventis Behring for the purpose of facilitating reduced production of plasma therapies in the United States. (Compl. ¶¶ 106-108.) Later, CSL Limited allegedly sought to acquire Talecris in order to achieve the same goal. (Compl. ¶ 192.) Even accepting CSL Limited's affidavit that it did not participate in the manufacture of plasma therapies, the allegations in the complaint suggest that CSL Limited participated in the antitrust conspiracy which was directed at controlling the supply of plasma therapies in the U.S. market. Thus, according to the complaint, CSL Limited's activities were directed at the United States, and plaintiffs' injuries arose out of those activities. Accordingly, CSL Limited's motion is denied.

### III. CONCLUSION

Defendants' motion to dismiss for failure to state a claim is denied. PPTA's separate motion to dismiss is denied. CSL Limited's motion to dismiss for lack of personal jurisdiction is denied.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 9, 2011