# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: PLASMA-DERIVATIVE | ) | Judge Joan B. Gottschall |
| PROTEIN THERAPIES | ) | MDL No. 2109 |
| ANITRUST LITIGATION | ) | Case No. 09 C 7666 |
|  | ) |  |

## MEMORANDUM OPINION & ORDER

The County of San Mateo ("San Mateo") filed suit against defendants CSL Limited, CSL Behring LLC, and CSL Plasma (collectively, "CSL"), Baxter International Inc. ("Baxter"), and Plasma Protein Therapeutics Association ("PPTA"), alleging that the defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1, as well twenty-five states' antitrust laws and fourteen states' unfair competition or consumer protection laws, by virtue of a conspiracy to "restrict output to artificially raise, fix, maintain and/or stabilize the prices of Plasma-Derivative Protein Therapies in the United States." (*See* Indirect-Purchaser Plaintiff's Class Action Compl. ¶ 280, ECF No. 367-2.) The defendants have moved to dismiss the complaint, arguing that San Mateo lacks standing to pursue its claims, and that certain of San Mateo's state law claims fail for various reasons. For the reasons stated below, the court grants in part and denies in part the defendants' motion and requests additional briefing as to certain issues.

## I. BACKGROUND

This multi-district litigation presently consists of almost twenty actions brought on behalf of direct and indirect purchasers of plasma-derivative protein therapies against the defendants. In their consolidated amended complaint (*see* ECF No. 222), the direct purchaser plaintiffs alleged that CSL and Baxter, the two largest domestic producers of plasma-derivative therapies, conspired along with PPTA, a trade association, to restrict supplies of plasma-derivative

therapies and to raise prices in violation of the Sherman Act, 15 U.S.C. § 1. All defendants moved to dismiss the consolidated amended complaint for failure to state a claim under the standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and PPTA and CSL filed separate motions arguing additional grounds for dismissal. The court denied all of these motions. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991 (N.D. Ill. 2011). In particular, while the court agreed that the defendants made "a somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with the firms' independent self-interest," the court noted that at the motion to dismiss stage, "the plaintiffs need only allege a conspiracy which is plausible in light of the competing explanations," which the complaint had done. *See id.* at 1002-03. Following that decision, the parties submitted a proposed scheduling order, which this court entered. (*See* ECF No. 330.) Under the schedule, the direct purchaser plaintiffs' motion for class certification is not due until November 2012, after fact discovery closes.

At about the same time that the court entered the scheduling order, the Judicial Panel on Multidistrict Litigation transferred to this court a putative class-action suit filed by a single named plaintiff, San Mateo, which was brought on behalf of indirect purchasers of plasma-derivative therapies. (*See* Compl. ¶ 23 ("Plaintiff brings this action, on behalf of itself and all those similarly situated in an Identified State that purchased Plasma-Derivative Protein Therapies indirectly from Defendants.").) In the complaint, San Mateo explains that it operates a medical center through which it administers a county-wide health care system. (*Id.* ¶ 28-29.) As part of that program, the medical center indirectly purchases plasma-derivative protein therapies for use in treating patients, for sale to patients via its pharmacies, and for laboratory use. (*Id.* ¶ 29.) Prior to 2007, San Mateo purchased these therapies from spot markets organized by independent

distributors or by group purchasing organizations ("GPOs") to which San Mateo belonged. (*Id.* ¶ 59.) Thereafter, San Mateo began purchasing annual allocations of the therapies either from distributors who had purchased the therapies from manufacturers, or from GPOs that negotiated contracts with manufacturers on behalf of their members. (*Id.* ¶ 60.) Despite these alternate arrangements, San Mateo claims it was forced to keep purchasing plasma-derivative protein therapies on the spot market at a higher price due to supply shortages caused by the defendants' conspiracy. (*Id.* ¶¶ 61-62.)

San Mateo alleges the same violation of § 1 of the Sherman Act that the direct purchasers alleged (Count I)[1], but it also alleges violations of various state antitrust laws (Count II)[2] and state unfair competition or consumer protection laws (Count III)[3]. San Mateo includes argument directed toward its attempt to proceed as a class action under Federal Rule of Civil Procedure 23, and defines its "Indirect Purchaser Class" as follows:

---

[1]    As the defendants note, San Mateo's complaint closely mimics—and in some instances appears to be taken verbatim from—the direct purchasers' consolidated amended complaint, at least with respect to the federal antitrust allegations. In contrast to the direct purchasers, however, San Mateo does not seek damages based upon the alleged § 1 violation. Such damages are not available to indirect purchasers under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); instead, San Mateo seeks injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. *See U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) ("[T]he direct-purchaser doctrine does not foreclose equitable relief."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 878 F. Supp. 1078, 1083 (N.D. Ill. 1995) ("Regardless of whether they are deemed indirect purchasers under *Illinois Brick* . . . all of the plaintiffs may still pursue injunctive relief under § 16 of the Clayton Act.").

[2]    These are Alabama, Alaska, Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Utah, Vermont, West Virginia, Wisconsin, and Wyoming. In its response, however, San Mateo agreed to dismiss the claims brought under the laws of Alabama and Maryland, as well as claims for damages based on Alaska and Wyoming law. (*See* Mem. in Opp'n to Defs.' Mot. to Dismiss at 1 n.1, ECF No. 369.) Therefore, these claims are dismissed.

[3]    These are Colorado, the District of Columbia, Florida, Illinois, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Nebraska, New Mexico, New York, and Utah. As above, San Mateo agreed to dismiss its claims with respect to Kentucky, Utah, Maryland, Kansas, and Massachusetts. (*See* Mem. in Opp'n to Defs.' Mot. to Dismiss at 1 n.1.) These claims are dismissed as well. San Mateo requests leave to amend to add claims pursuant to Mass. Gen. Laws ch. 93A, §§ 9 and 11, but having heard no argument with respect to the prejudice or futility of such an amendment, the court denies the motion at this time. If and when San Mateo is actually in a position to amend, it may seek leave to do so by filing a separate, properly briefed motion.

> All persons and entities in the United States who purchased Plasma-Derivative Protein Therapies indirectly from any Defendant at any time from at least as early as July 1, 2003 through the present ("Class Period") and, which meet the definition of one or more of the Identified State Subclasses. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

San Mateo also defines thirty putative subclasses using this definition and replacing "the United States" with the name of each relevant state. San Mateo seeks to proceed under Rule 23(b)(3), arguing that common questions of fact will predominate in this case.

Together, the defendants have moved to dismiss the complaint under Rule 12(b)(6). First, they argue that this court should decide the issue of San Mateo's Article III standing before deciding whether to certify the class, and that San Mateo—being located in California and having not purchased plasma therapies in any other state—lacks standing to proceed except as to its California state law claims. Further, the defendants claim that San Mateo lacks antitrust standing based on the considerations delineated in *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983), and that all of San Mateo's claims should be dismissed for this reason. Finally, the defendants allege that San Mateo's state law claims fail for various reasons, which the court does not reach at this time.

## II. LEGAL STANDARD

Under Rule 12(b)(6), the defendant may seek to dismiss the case if the plaintiff "fail[s] to state a claim upon which relief can be granted." The court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. *Stayart v. Yahoo! Inc.*, 623 F.3d 436, 438 (7th Cir. 2010). But although Rule 8(a) only requires the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," nonetheless the complaint must include "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The relevant question is whether the complaint includes enough factual allegations to "raise a right to relief above the speculative level." *Id.* In other words, to survive a motion to dismiss post-*Twombly*, "'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together,' and the question the court should ask is '*could* these things have happened, not *did* they happen.'" *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404-05 (7th Cir. 2010)).

Moreover, Rule 8 "simply specifies the conditions of the formal adequacy of a pleading"—it does not set forth the complaint's "substantive adequacy, that is, its legal merit." *Cnty. of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 818 (7th Cir. 2006) (quoting *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) (internal quotation marks omitted)). Thus, the non-moving party is required to provide some legal basis in support of his complaint, and "although the district court is required to consider whether a plaintiff could prevail under any legal theory or set of facts, it 'will not invent legal arguments for litigants,'" nor is it "'obliged to accept as true legal conclusions or unsupported conclusions of fact.'" *Id.* (quoting *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002), and *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995)).

## III. ANALYSIS

### A. Article III Standing and Class Certification

The standing inquiry is, at heart, an inquiry into whether a particular litigant "is entitled to have the court decide the merits of the dispute or of particular issues." *Allen v. Wright*, 468 U.S. 737, 750-51 (1984) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations

on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth*, 422 U.S. at 498). The limitations on federal court jurisdiction stem from the Article III "case or controversy" requirement; a litigant cannot proceed unless he demonstrates "injury in fact plus redressability." *Kochert v. Greater Lafayette Health Serv., Inc.*, 463 F.3d 710, 714 (7th Cir. 2006). In the case of alleged antitrust violations, prudential considerations also oblige the litigant to demonstrate what has been called "antitrust standing." *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5-6 (1986). The court turns to Article III standing and class certification first. *See Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008) ("[T]he prudential standing analysis assumes satisfaction of the Article III requirements.").

The defendants do not challenge San Mateo's Article III standing under the Sherman and Clayton Acts, nor do they argue that San Mateo lacks standing under California's Cartwright Act. Instead, the defendants focus on San Mateo's standing to bring the non-California state-law claims on behalf of unnamed putative class members. San Mateo claims that it is not seeking relief "*on behalf of itself*, under any law other than California's Cartwright Act," that "all of the damages sought under these thirty-six state laws are on behalf of the unnamed members of the putative class," and that "it is these unnamed putative class members' Article III standing to pursue such claims that is relevant, not [San Mateo's]." (Pl.'s Mem. of Law in Opp'n at 11 n.5, ECF No. 369.) Therein lies the crux of the debate: The defendants argue that the court must determine whether San Mateo has standing to pursue these claims *before* certifying a class, and that since San Mateo is located in California and did not purchase plasma therapies in other states, it lacks such standing. San Mateo counters by arguing that class certification is "logically

antecedent" to Article III standing, and that the court should certify the class, then determine Article III standing "with reference to the class as a whole."

San Mateo's "logically antecedent" language is drawn from two decisions, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) and *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), wherein the Supreme Court grappled with attempts to settle an asbestos tort liability case. The settlement as proposed would have applied to "exposure-only" class members, *i.e.*, unnamed class members who did not yet suffer from any asbestos-related physical injury. While the Court recognized the general rule that "Article III court[s] must be sure of [their] own jurisdiction before getting to the merits," it went on to note that in *Ortiz* and *Amchem*, the class certification issues were "'logically antecedent' to Article III concerns" and therefore could "properly be treated before Article III standing." *Ortiz*, 527 U.S. at 831; *see Amchem*, 521 U.S. at 612. The Court then delved into a detailed analysis of class certification issues, while staying "'mindful that [Rule 23's] requirements must be interpreted in keeping with Article III constraints.'" *Ortiz*, 527 U.S. at 831 (quoting *Amchem*, 521 U.S. at 612-13).

As one observer noted, this "logically antecedent" concept "has caused a great deal of mischief." *See* Linda S. Mullenix, *Standing and Other Dispositive Motions After* Amchem *and* Ortiz: *The Problem of "Logically Antecedent" Inquiries*, 2004 Mich. St. L. Rev 703, 707 (Fall 2004). Some courts have taken an almost categorical approach, routinely resolving class certification questions prior to conducting a standing inquiry. *See In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 653-57 (E.D. Mich. 2011) (providing a good overview of the state of the law). Others have taken a "nuanced" approach, attempting to fashion a governing principle to determine when class certification is considered "logically antecedent." *See* Mullenix, 2004 Mich. St. L. Rev at 727 (describing *Payton v. Cnty. of Kane*, 308 F.3d 673 (7th Cir. 2002) and

*Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002)).  Finally, some courts limit *Ortiz* and *Amchem* to the "very specific situation of a mandatory global settlement class," and do not interpret those cases to require courts to consider class certification before standing.  *See, e.g.*, *Easter v. American West Fin.*, 381 F.3d 948, 962 (9th Cir. 2004).  Even with in this district, courts have not always taken a uniform view.  *Compare, e.g.*, *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov 05, 2009) ("*Ortiz* created an exception, limited to class actions, to the general rule that courts address standing as a threshold matter."), *with In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 920-23 (N.D. Ill. 2009) ("*Ortiz,* as properly understood within the context of *Georgine* and *Amchem,* does not *require* district courts to postpone the threshold inquiry into Article III standing until after class certification."), *rev'd on other grounds sub nom. Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th Cir. 2011).

Relevant here, the Seventh Circuit has applied the "logically antecedent" test beyond the narrow confines of the original *Amchem* and *Ortiz* decisions.  *See Payton*, 308 F.3d at 680.  On the other hand, even after *Ortiz* and *Amchem* the Seventh Circuit has continued to resolve standing challenges before class certification.  *See, e.g.*, *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008) (resolving standing as "an antecedent legal issue" prior to evaluating class certification).  Together, the court interprets these decisions to mean that while *Ortiz* and *Amchem* are not confined to their particular facts, class certification issues are not always appropriate for a pre-standing evaluation.  In this case, the court concludes class certification issues are not logically antecedent to the Article III standing question, but that San Mateo has established standing sufficient to allow it to pursue its non-California state-law claims for the time being.

San Mateo would have the court interpret the Seventh Circuit's *Payton* decision expansively.  It argues that where a plaintiff is injured by "the same course of conduct for which it seeks a remedy on behalf of the class" and has standing under the laws of its "home state," standing for the remaining state-law claims must be addressed after class certification.  (Pl.'s Mem. of Law in Opp'n at 9-10.)  In the court's view, *Payton* should not be read so broadly.  In that case, six arrestees who had been released on bail from various county jails filed a putative class action challenging an Illinois law that permitted the counties to impose a special bail fee as a condition for release.  That fee was set individually by each county, and cost between $1 and $45.  The named plaintiffs sought to certify a class that would include everyone who paid the fee in nineteen counties, even though the named plaintiffs had direct claims in only two.  The district court had dismissed all of the claims and denied the motion for class certification as moot.  Upon review, the Seventh Circuit quickly concluded that the named plaintiffs had individual standing to proceed on their direct claims, and that the case should have advanced to the class certification stage as to those two counties.  The Seventh Circuit then turned its attention to the "thorniest issue in this case: the propriety of maintaining a suit against the other 17 counties, for which we have no specific named plaintiffs."  *Payton*, 308 F.3d at 677-78.

The court began by undertaking a detailed discussion of the "juridical link" doctrine, which permits a class action claim to go forward where "the plaintiffs as a group—named and unnamed—have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or [are] otherwise 'juridically related in a manner that suggests a single resolution of the dispute would be expeditious.'"  *Id.* at 678-79 (quoting *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973)).  Because the bail bond fee was permitted by state-wide statute, the constitutionality of that fee would not differ from one county

to the next. Therefore, the Seventh Circuit concluded that the district court should have considered class certification first. *Payton*, 308 F.3d at 680. But in so deciding, the court emphasized that the existence of the Illinois statute "assure[d] that the representative ha[d] the *same legal claim* as the unnamed parties." *Id.* at 681-82 (emphasis added). The court also went on to stress that a named plaintiff cannot "acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs," since "a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action." *Id.* at 682 (internal quotation marks and citations omitted).

Thus, in *Payton* the court found a juridical link between the defendants because the named and unnamed plaintiffs suffered identical injuries based on a uniform state law; this made it appropriate to engage in a class certification analysis prior to delving into standing. San Mateo's attempt to analogize to its own case falls flat. It would have the court look to the existence of the alleged conspiracy, as that conspiracy "is alleged to have caused injuries to all members of the class." (Pl.'s Mem. of Law in Opp'n at 7-8 n.4.) While this is true, to focus on a general "course of conduct" is to miss the mark; instead, it is the specific legal claims that are relevant. When San Mateo claims *not* to seek relief "on its own behalf" for the non-California state-law claims (*see* Pl.'s Mem. of Law in Opp'n at 11 n.5), it effectively concedes that it suffered no injury and has no claim as to those states. Thus, the class certification issue is not "logically antecedent," because "[a] ruling as to the named plaintiffs' standing depends in no way upon the standing of proposed class members." *See In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 155 (E.D. Pa. 2009) (also noting that in *Ortiz* and *Amchem*, "the question of whether

the proposed class members could become parties to the case was logically antecedent to the question of whether they had standing to make claims against the defendants in those cases").

Because class certification issues are not logically antecedent here, the court addresses San Mateo's standing to pursue the state-law claims. To the extent that San Mateo does not claim to suffer its own personalized injury by virtue of the defendants' alleged violations of non-California state-law, San Mateo lacks standing to assert those claims. *See Lewis v. Casey,* 518 U.S. 343, 357 (1996) ("[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'") (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, n.20 (1976)); *Payton*, 308 F.3d at 682.

That is not the end of the inquiry: San Mateo alleged that it was forced to purchase plasma-derivative protein therapies on the spot market, and in its opposition it claims that these spot markets required San Mateo to purchase the therapies "from anyone in the nation that had a sufficient supply," creating an open question as to where each purchase took place.[4] Nowhere in the complaint did San Mateo actually allege that a purchase took place in another state. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss at 8 ("San Mateo does not allege it made even a single plasma purchase in any state.").) Nor does the 134-page complaint contain any specific allegation that San Mateo suffered a personalized injury due to the defendants' alleged violations of other states' laws. But while "[t]he party seeking to invoke federal jurisdiction . . . has the burden of establishing that it meets the requirements of standing," *Disability Rights Wis., Inc.*,

---

[4]        San Mateo also argues that it has standing to pursue at least some of its non-California state-law claims either because some states do not require any part of the alleged injury to have occurred within the state (*e.g.*, Michigan, Colorado), and because some states' statutes do not clearly require an in-state purchase (*e.g.*, Arizona, Wyoming). None of this obviates the need for San Mateo to establish a personalized injury in fact.

522 F.3d at 800, at this stage San Mateo does not have to make specific allegations. Instead, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 889 (1990)); *cf. Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-45 (7th Cir. 2009) (holding the plaintiff to a higher standard where the defendant mounted a factual attack on the plaintiff's standing). While the complaint is silent as to how and where the alleged spot market transactions took place, the allegation of spot market purchases is the type of general allegation that is sufficient at this stage. *See Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 709-10 (7th Cir. 2003) ("We keep in mind that to survive a motion to dismiss . . . a plaintiff need not include the particulars of his claim; only a 'short and plain statement' is needed. This is also true for antitrust cases.").

None of this is to say that San Mateo will be able to establish standing at the summary judgment stage. Standing is not a "mere pleading requirement[ ], but rather an indispensable part of the plaintiff's case," which means that each element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Apex Digital*, 572 F.3d at 443 (quoting *Lujan,* 504 U.S. at 561). Ultimately, San Mateo must support its standing with more than mere "unadorned speculation." *See Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir. 2001). For the time being, however, San Mateo has provided sufficient general allegations of its own individualized injury for its non-California state-law claims, and the court will not dismiss these claims for lack of Article III standing. As with the direct purchaser plaintiffs, any attempt

by San Mateo to certify an indirect purchaser class shall proceed according to the case management schedule already in place.

**B. Antitrust Standing**

To establish antitrust standing, San Mateo must demonstrate both that (1) it has suffered an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful," *Cargill*, 479 U.S. at 109 (quotation marks and citation omitted); and (2) it is the "proper party" to maintain an antitrust action. *See AGC*, 459 U.S. at 535 n.31 ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."); *Kochert*, 463 F.3d at 715-16 (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597-98 (7th Cir. 1995)); *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374 (7th Cir. 1987). The court has little difficulty in concluding that San Mateo alleges an antitrust injury, because San Mateo claims that the defendants conspired to reduce output, thereby forcing San Mateo to pay higher prices. This is a core antitrust injury. *See U.S. Gypsum Co.*, 350 F.3d at 626-27 ("A private plaintiff must show antitrust injury—which is to say, injury by reason of those things that make the practice unlawful, such as reduced output and higher prices."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 825 (7th Cir. 1999) ("To recover under the antitrust laws, the plaintiff must show that its injury flows from that which makes the conduct an antitrust problem: higher prices and lower output.").

The "proper plaintiff" determination is less straightforward. In general, a court evaluates that issue by reference to the Supreme Court's *AGC* opinion, which requires "a case-by-case analysis [of] the link between a plaintiff's harm and a defendant's wrongdoing." *Loeb Indus. Inc.*

*v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002) (citing *AGC*, 459 U.S. at 535-36). A number of factors are considered: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *Id.* (citing *AGC*, 459 U.S. at 537-45); *see Kochert*, 463 F.3d at 718.

Here, the defendants argue that *AGC* governs both the state and federal antitrust claims, and that the application of the *AGC* factors demonstrates San Mateo's lack of antitrust standing. San Mateo responds that *AGC* is inapplicable because this case involves horizontal price fixing on behalf of indirect purchasers "who are 'down a chain of supply' of the price-fixed product." (*See* Mem. in Opp'n at 13 (quoting *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041 at *7).) Furthermore, San Mateo claims that to apply *AGC* here would be to undermine the states' intent in enacting their own indirect purchaser antitrust legislation. San Mateo also argues that it has antitrust standing based on the factors set forth in *AGC*.

It is not clear whether San Mateo directs its "supply chain" argument to only the state law antitrust claims, or whether it argues that the reasoning in *Aftermarket Filters* applies to its federal antitrust claim as well. In any event, *Aftermarket Filters* is the only authority San Mateo cites in support of its argument that *AGC* is generally inapplicable to the case. In *Aftermarket Filters*, the district court concluded that "*AGC* was obviously never intended to apply to [a] situation involving claims of price fixing down a chain of distribution, because in the federal context such claims were already barred by *Illinois Brick*," and that "*AGC* has no application to actions brought by Direct and Indirect Purchasers alleging a conspiracy to fix prices in an entire physical market." *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *7. The court

14

seemingly went on to limit *AGC* to cases in which "the defendants' conduct causes damage in two separate but related markets." *Id.* (citing *Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481-85 (7th Cir. 2002)).

To the extent that *Aftermarket Filters* supports San Mateo's argument, this court must respectfully disagree with the reasoning set forth therein. *AGC* is not so limited. First, *Illinois Brick* does not resolve the question at hand, because *Illinois Brick* bars indirect purchasers only from bringing federal antitrust claims for damages. Injunctive relief under § 16 of the Clayton Act remains available, and necessitates an antitrust standing inquiry. *See Int'l Bhd. of Teamsters*, 196 F.3d at 823, 828 (noting that the "direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of *Associated General Contractors* are analytically distinct" and are "independent obstacle[s] to recovery"). And in any event, the antitrust standing doctrine was not created by the Supreme Court in *AGC*; instead, the *AGC* analysis "was an attempt by the Court to synthesize and clarify the confusing collection of the then-extant antitrust-standing rules." *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 850-51 & n.13 (3d Cir. 1996) ("Recognizing that these alternative formulations for assessing antitrust standing often led to contradictory and inconsistent results, the Supreme Court in *AGC* attempted to articulate a unified set of factors that could be applied generally in determining antitrust standing."). Thus, courts have understood *AGC* to incorporate the principles of *Illinois Brick*, *id.*, and they have applied the *AGC* factors to cases that involve a single chain of distribution. *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) (evaluating § 16 claim for injunctive relief brought by indirect purchasers of a prescription drug by reference to the *AGC* factors). While courts also have applied *AGC* to cases that involve "two separate but related markets," this court cannot identify any reason to limit *AGC* to such a scenario.

The court therefore will apply *AGC*, at least to the federal claim. As an indirect purchaser, San Mateo may seek only injunctive relief. This fact necessarily modifies the court's analysis, because "standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries." *See Cargill*, 479 U.S. at 110-111 n.6. Still, the *AGC* analysis remains "effectively the same." *Sw. Suburban Bd. of Realtors, Inc.*, 830 F.2d at 1377-78. In effect, the court is left to consider the presence of improper motive, the causal connection between the violation and the harm, and the directness of the injury. San Mateo has alleged, *inter alia*, that the defendants intentionally signaled each other, "scrubbed" meeting minutes to hide evidence of their conspiracy, and purposefully restricted supplies of plasma-derivative protein therapies in order to raise prices. "As intent and motive may be generally averred in a pleading, *see* Fed. R. Civ. P. 9(b), this is a sufficient allegation of improper motive." *Omnicare, Inc. v. Unitedhealth Group, Inc.*, 524 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007). San Mateo also has alleged a causal connection between the Sherman Act violation and the harm it purports to have suffered, as it alleges that it paid higher prices by virtue of the conspiracy to reduce output.

But it is the directness of the injury that weighs "particularly heavily" in the court's mind, because "'[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general.'" *See Kochert*, 463 F.3d at 718-19 (quoting *AGC*, 459 U.S. at 542). In this case, the existence of a less remote party to vindicate the public interest is no hypothetical proposition: the direct purchasers are actively pursuing their claims, and they seek damages and the same injunctive relief sought by San Mateo. By denying San Mateo leave to proceed, the court will not "leave a significant antitrust violation undetected or unremedied." *Id.* (citing *AGC*, 459 U.S. at 542). The court

concludes that, based upon prudential considerations, San Mateo lacks antitrust standing to pursue its federal antitrust claim.

## C. Subject Matter Jurisdiction and the MDL

The parties have raised a number of other important issues, including whether and how the *AGC* factors apply to each of the various state antitrust claims San Mateo seeks to bring, and whether San Mateo fails to state a claim for relief because, *inter alia*, it fails to plead with the particularity required by Rule 9(b). Those questions must be put off for the time being, because the court must address two issues that have not been briefed by either party: whether the court has subject matter jurisdiction, and whether the dismissal of the federal antitrust claim has any effect on whether this particular case should continue as part of the multi-district litigation.

First, although San Mateo set out class allegations in its complaint, it did not mention the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) as a basis for this court's jurisdiction. Instead, it alleged federal jurisdiction by virtue of § 16 of the Clayton Act, 15 U.S.C. § 26 (for injunctive relief based on the defendants' alleged violation of § 1 of the Sherman Act), and cited 28 U.S.C. §§ 1331 and 1337. (*See* Compl. ¶ 25.) Section 1332(d) is only mentioned in its response to the defendants' motion to dismiss, when San Mateo admits that its case "primarily involves state law," and that the case would have proceeded before a state court save for the fact that CAFA is now in effect. (*See* Mem. in Opp'n to Defs.' Mot. to Dismiss at 1.)

Based on the court's ruling above, the federal claim is now dismissed. This court must determine whether it has subject matter jurisdiction. *See Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007). At present, the court has no idea whether San Mateo's complaint meets CAFA's jurisdictional requirements. San Mateo may have satisfied the requirement for at least 100 proposed class members. *See* 28 U.S.C. § 1332(5)(B), Compl. ¶ 302 (describing

"thousands of Class members"). But the complaint never sets forth the amount in controversy, which must "exceed[ ] the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(2). Moreover, the court does not know whether there is any basis for the court to decline to exercise jurisdiction under CAFA. Because it is San Mateo that seeks to establish federal jurisdiction, it is San Mateo's burden to establish the jurisdictional facts by a preponderance of the evidence. *See Blomberg v. Serv. Corp. Int'l*, 639 F.3d 761, 763 (7th Cir. 2011).

Second, even if federal jurisdiction exists by virtue of the CAFA, the other cases that have been transferred to this court all relate to direct purchaser claims under the Sherman Act. Not only does this case involve an indirect purchaser (or purchasers), but the federal claim has been dismissed, leaving the court with nothing but a myriad of state-law claims. It is clear that this case will complicate and delay the proceedings. Because the only potential basis for federal jurisdiction is CAFA, the court questions whether this particular case should remain a part of this multidistrict proceeding or whether it belongs in the Northern District of California.

As San Mateo bears the burden of proof on the subject matter jurisdiction question, it shall file an initial brief on these issues by February 10, 2012; the defendants' response is due March 2, 2012, and San Mateo's reply is due March 9, 2012. The briefs are not to exceed fifteen pages.

## IV. CONCLUSION

For the reasons stated above, the court concludes that San Mateo has Article III standing to pursue its state-law claims, but lacks antitrust standing to pursue its federal claim. The federal claim therefore is dismissed, and the remaining issues are held in abeyance pending the

completion of briefing as to this court's subject matter jurisdiction under CAFA and the propriety of keeping this case as part of the multi-district referral.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: January 9, 2012