UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | Case No. 09 C 7666<br>MDL No. 2109 |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |

**DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DOWNSTREAM DISCOVERY AND DIRECT PURCHASER PLAINTIFFS' <u>REPLY IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER</u>**

**I.      INTRODUCTION**

Defendants have sought to expand the scope of discovery in this action exponentially by requesting "downstream" information that is irrelevant to any claim or defense of any party in this price-fixing case, and that would be unduly burdensome to produce. Defendants have sought this discovery from: absent class members who have never participated in this action; other non-parties; the Mayo Clinic (an absent class member for nearly two years at this point); and, less than one week ago, the Direct Purchaser Class Representatives.[1] The burden on any one of these entities of producing this legally irrelevant material would be substantial. Collectively, Defendants' effort would vastly expand the scope of discovery in this case, imposing on litigants, non-parties, and the Court alike an enormous additional burden that is wholly unjustified as a matter of black-letter law.

---

[1] As Defendants note, this Multidistrict Litigation is comprised of two distinct actions: (1) an action brought on behalf of "direct purchasers" of Albumin and IVIG seeking relief under the Sherman Act; and (2) an "indirect action" brought on behalf of "indirect purchasers" of Albumin and IVIG under approximately 27 separate state laws. Pursuant to Judge Gottschall's Order of January 9, 2012, currently pending before Judge Gottshcall is a request to transfer the "indirect action" to the Northern District of California.

Defendants' primary justification for seeking this sweeping downstream discovery from direct purchasers is that "downstream information will show whether the Direct Purchasers resold Ig and Albumin to indirect purchasers for profit, which is relevant to the question whether the Direct Purchasers' claims are typical of the class and whether they are able adequately to represent the interests of the class as a whole." Memorandum in Support of Motion to Compel ("MTC Mem.") at 3. It is well-settled, however, that in price-fixing cases brought pursuant to the Sherman Act, "whether the Direct Purchasers resold Ig and Albumin to indirect purchasers for profit" is irrelevant; the Supreme Court has determined that direct purchasers in a price-fixing case are "injured" by a price-fixing conspiracy and entitled to recover the overcharges they paid *regardless of what they did with the purchased product, including whether they actually suffered any financial harm or passed the financial harm to entities further down the distribution chain*. See *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746, 762 (1977); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968). The reason for this rule is simple: antitrust actions are by their very nature complex and expensive to litigate even absent consideration of "pass-on" defenses and "downstream" information. *Id.* Requiring courts to consider these issues would turn antitrust actions into the modern-day equivalent of Charles Dickens' *Jarndyce v. Jarndyce*,[2] exponentially increasing the burden of such litigation on courts and litigants, with no attendant upside. This reality has led the "vast majority of courts that have entertained discovery disputes concerning discovery of such 'downstream' information [to] decline[] to compel plaintiffs to produce discovery about those matters." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 4916723, *2 (E.D.N.Y. Nov. 24, 2010). This Court should be no exception.

---

[2] *See* Charles Dickens, *Bleak House*, recently cited by Chief Justice Roberts as a cautionary tale for courts overseeing modern complex litigation. *Stern v. Marshall*, 131 S. Ct. 2594, 2600 (2011).

Defendants also attempt to shoehorn the requested discovery into the direct purchasers' case by claiming that it is relevant to the indirect purchaser action and thus will be produced in any event. Setting aside whether Defendants are ultimately right about that, which we understand the indirect purchasers separately will address, the Court's resolution of that issue is premature, as the indirect purchasers recently have filed a motion for remand which, if successful, would send their case back to the Northern District of California. It would waste the time and resources of the parties and the Court to rule on this motion in the indirect action when that action may be transferred to another court. Moreover, it is well-settled that downstream discovery from direct purchasers is not allowed simply because a parallel indirect purchaser action is ongoing, whether or not downstream discovery is warranted in the indirect purchaser case.

As set forth below, this Court should: (1) refuse to order the direct action class representatives to produce any financial downstream data because it is entirely irrelevant; (2) decline to rule on the discoverability of downstream data in the indirect action; and (3) not permit Defendants to obtain the discovery they seek from absent class members.

**II.     ARGUMENT**

    **A.     Defendants Have Waived Any Claim To Discovery of Materials Contained In Individuals' Medical Records.**

As a preliminary matter, it is important to note that Plaintiffs have sought preclusion of two types of downstream discovery: financial downstream data and individual healthcare downstream data. Memorandum in Support of Motion for Protective Order ("PO Mem.") at 1. Defendants have apparently abandoned their effort to obtain the latter category of material, directing all of their arguments at the financial downstream data and documents.[3] Defendants' failure to brief the

---

[3] Moreover, in CSL's Reply Memorandum supporting its Motion to Compel the Mayo Clinic to Produce Documents, CSL expressly states that "CSL does not seek patient files from Mayo Clinic" and "CSL has no interest in requiring Mayo Clinic to search patient medical files to obtain . . .

issue of discovery from individual patient records waived that argument. *See generally Weinstein v. Schwartz*, 422 F.3d 476, 477 n. 1 (7th Cir. 2005) (collecting cases and finding that a litigant's failure to raise or meaningfully develop an argument or issue waives it); *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 551 (7th Cir. 2004) ("Judges are not like pigs, hunting for truffles buried in briefs") (internal quotation marks and citation omitted).

### B. Direct Purchasers' Downstream Information Is Irrelevant.

Defendants' principal argument for the production of downstream data by the direct purchasers, which appears to be an afterthought confined to the last three pages of Defendants' main brief, is that "Downstream information will be necessary for the Court to conduct a 'rigorous analysis' of adequacy of representation and typicality." MTC Mem. at 12. Defendants elaborate that they need downstream discovery "to determine whether there were net winners, which may prevent class certification" because "a class may not be certified if 'it contains a great many persons who have suffered no injury at the hands of the defendant.'" MTC Mem. at 13-14, citing *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009). Contrary to Defendants' claim, however, it could not be plainer that a direct purchaser may be a "net winner" and nonetheless be injured as a matter of antitrust law because it paid overcharges. Although Defendants coyly claim that they "are not *necessarily* seeking [downstream] information in order to facilitate a pass-on defense," MTC Mem. at 12 (emphasis added), their argument should be rejected for what it is: "just an artfully stated, but thinly disguised pass-on argument." *In re K-Dur Antitrust Litig.*, 2007 WL 5302308, *13 (D.N.J. Jan. 2, 2007).

---

information." Reply Memorandum at 6. Defendants also state, with respect to the Indirect Action, that they "are not interested in obtaining patient files." MTC Mem. at 12 n. 7. CSL has thus expressly disavowed that it seeks information regarding the individualized use or application of IVIG or Albumin therapies that is contained in medical files of individual patients from the Mayo Clinic and from Indirect Plaintiff County of San Mateo, and appears to have abandoned any efforts to obtain such information from the direct purchaser class representatives.

4

1.  **There Are No "Winners" and "Losers" in Price-fixing Cases.**

Conspiring to restrict output and thus artificially raise or maintain prices, as Plaintiffs have alleged Defendants did here, is a *per se* violation of federal antitrust law. *See e.g., Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) (Posner, J.) ("An agreement on output… equates to a price-fixing agreement."). The injury Plaintiffs allege they have suffered is the overcharge they paid for Defendants' products that they would not have paid absent the conspiracy. The Supreme Court clearly has stated that "direct purchasers [are] injured to the full extent of the overcharge paid," *even where* direct purchasers may actually have benefitted from Defendants' conspiracy: "Where the choice is between a windfall to [direct purchaser] intermediaries or letting guilty defendants go free, liability is imposed." *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746, 762 (1977), citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 494 (1968). Thus, with respect to overcharges paid by direct purchasers there are—as a matter of law—no "winners" and "losers" with "conflicting" interests: all overpaid at the time of purchase. *See In re K-Dur*, 2007 WL 5302308, *12 ("Because all members of the putative class in this case will be entitled to the same measure of damages if successful—the amount of the overcharge—there can be no conflict within the putative class on the issue of damages."); *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 85 (E.D.N.Y. 2000) *aff'd, In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) (Defendants' argument "that some merchants garner incremental sales from accepting the cards, [which] would create 'winners' and 'losers' and render class-wide assessment of injury inappropriate" was "immaterial when an antitrust plaintiff proceeds on an 'overcharge theory' of damages."), *citing New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1079 (2d Cir.1988) ("[A]ntitrust treble-damage actions should not be complicated by a need to trace the effects of the overcharge with respect to such

matters as prices, costs, and the potentially different behavior of all the pertinent variables in the absence of the overcharges."); *In re Vitamins Antitrust Litig.,* 198 F.R.D. 296, 301 (D.D.C. 2000) ("Whether certain buyers made profits is irrelevant to the question of whether those buyers actually paid higher prices as a result of the alleged conspiracy to fix prices.").

### 2. *Valley Drug* Cannot Sustain Defendants' Arguments.

Against this overwhelming weight of authority, Defendants essentially base their entire argument that they need downstream discovery on one factually distinguishable and widely criticized outlier case that has been the subject of substantial judicial critique: *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181 (11th Cir. 2003). This case cannot sustain Defendants' arguments.

First, and critically, *Valley Drug* was *not* a price-fixing case, and did not involve conduct that was a *per se* violation of the antitrust laws. *Valley Drug* was a "pay for delay" or "reverse payment agreement" case where a manufacturer paid generic companies in exchange for the generics' agreements to refrain from selling their generic drug until the expiration of the manufacturer's contested patents. *Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1300 (11th Cir. 2003). The *Valley Drug* court did not consider these cases *per se* antitrust violations. *Id.* at 1304 ("we reject the district court's characterization of the instant Agreements as illegal *per se*"); *see also In re Ciproflaxacin Hydrochloride Antitrust Litig.,* 544 F.3d 1323 (Fed.Cir. 2008) (applied a rule-of-reason analysis to manufacturer's supply and payment agreement with manufacturers' of generics in affirming the district court's grant of the defendants' motion for summary judgment). Under the "Rule of Reason," a court is required to determine *whether the plaintiffs were actually harmed by the conduct at issue. Cf. Valley Drug,* 344 F.3d at 1309. As set forth above, *per se* price-fixing cases such as this one contain no similar requirement. This

distinction renders *Valley Drug* inapposite, because whether some class members passed on their overcharges is irrelevant as a matter of law.[4]

Unsurprisingly, courts overseeing price-fixing litigation have almost universally refused to follow *Valley Drug*, and have criticized its reasoning even within the context of its own facts. *See, e.g., Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 304 (D.D.C. 2007) (noting that "the Eleventh Circuit's holding fails to appreciate the true import of the *Hanover Shoe* rule that a direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted, because the antitrust injury occurs and is complete when the defendant sells at the illegally high price."); *see also* Plaintiffs' Opening Memorandum at 6, n. 5, and authorities cited therein.

### 3. Plaintiffs' Purchasing Power is Not Relevant to Class Certification.

In the *only* part of their argument that does not rest on an attempt to shoehorn this case into the mold of *Valley Drug*, Defendants state that "downstream information will show whether putative members have different levels of leverage, and buying power, in relation to Defendants," claiming that this might be relevant to issues of class certification. Defendants' sole support for this notion is *In re Urethane Antitrust Litigation*, 237 F.R.D. 454, 461 (D. Kan. 2006). MTC Mem. at 10-11, 14-15. This argument is a non-starter. To the extent that such variations in

---

[4] In an effort to bolster their wrong-headed argument with support from the Seventh Circuit, Defendants cite to several cases that, if anything, only serve to undermine their position. The cases do not support Defendants' argument even in their general principles and, most importantly, none is an antitrust price-fixing case: they are a securities action, a takings action, and an ERISA action, and thus do not present the scenario where, as here, Direct Purchasers sustain injury as a matter of law. *See Kohen*, 571 F.3d at 677 (it is "almost inevitable" that "a class will often include persons who have not been injured by the defendant's conduct" and this does not preclude class certification); *Bieneman v. City of Chi.*, 864 F.2d 463, 464-65 (7th Cir. 1988) (declining to certify class in airport-noise case because homeowners were very differently situated from one another); *Neil v. Zell*, 275 F.R.D. 256, 266 (N.D. Ill. 2011) ("the conflicting economic interest necessary to render a representative inadequate must be of the type that, *if that plaintiff succeeds, would result in identifiable harm* to some member of the class.") (emphasis added).

purchasing power exist among class members, those issues will be evidenced in the plaintiffs' *own* records of *purchases* that already are being produced to Defendants, as well as Defendants' *own* sales records to Plaintiffs and other class members. Downstream data is (at best) an imprecise proxy for buying power that purchasing data direct purchasers have already produced directly demonstrates.

Not surprisingly, the questionable reasoning of *In re Urethane* has been rejected by several other courts. *See, e.g. In re Air Cargo*, 2010 WL 4916723 at *3 (rejecting *In re Urethane* and stating that issues concerning supply, demand, pricing and discounting that need to be resolved are not in the downstream markets *but in the upstream market* where the plaintiffs were alleging they were overcharged) (emphasis added); *In re Aspartame Antitrust Litig.*, 2008 WL 2275528 at *5 (E.D. Pa. Apr. 8, 2008) (rejecting defendants' argument that downstream discovery was necessary to determine plaintiffs' "buying power, elasticity of demand and leverage" which defendants alleged would bear on class certification issues); *In re Vitamins*, 198 F.R.D. at 301 (plaintiffs' economic power irrelevant where the crucial issue is whether there was a conspiracy to fix prices). Indeed, even the *In re Urethane* court itself, when later confronted with evidentiary material setting forth the enormous burden that complying with some of the requested downstream discovery would impose on several direct purchaser plaintiffs, ultimately denied the defendants' motion to compel those parties to produce such discovery. *See* "Memorandum and Order" denying defendants' motion to compel, *In re Urethane Antitrust Litig.*, No. 04-MD-1616 (N.D. Ohio Jan. 8, 2008), attached hereto as Exhibit 1.

The Court should not allow Defendants to circumvent the holdings of *Illinois Brick* and *Hanover Shoe* by simply stating that they "are not necessarily seeking this information in order to facilitate a pass-on defense" and are seeking it because it is relevant to issues of class certification.

8

As set forth in Plaintiffs' initial memorandum, the rationale of the Supreme Court's holdings in *Hanover Shoe* and *Illinois Brick* was an effort to minimize, to the extent possible, the inherent complexities of antitrust litigation. PO Mem. at 5. It would vitiate those holdings for defendants to be able to assert that downstream discovery is relevant to class certification issues without being able to provide a compelling and atypical story why that is so. Defendants have not done so here. In sum, the Court should not order the direct purchaser Plaintiffs to produce financial downstream data because such data are irrelevant.

> C. Any Marginal Relevance of Financial Downstream Data from Plaintiffs is Outweighed by the Burden of Production.

Even if the Court credits Defendants' claim that downstream financial discovery has some relevance to this matter, which it should not, any marginal relevance of such data would be far outweighed by the burden of such production. *See In re Aspartame*, 2008 WL 2275528 at *3 ("[T]o determine whether downstream data is discoverable, a court must first determine if requested information is relevant to the issues presented in the action, and if it is deemed relevant a court must then weigh the benefits of this information to the defendant against the burdens to the plaintiff."); *In re Vitamins*, 198 F.R.D. at 301 ("The next question, assuming that the individualized downstream data is at least marginally relevant, is whether the benefit to defendants of having this data available exceeds the burden to plaintiffs of producing this information.").

Defendants have failed to specify exactly what downstream data they are seeking from Plaintiffs, but it apparently includes "data and documents reflecting plaintiffs' 'actual or proposed purchases and sales of Ig and/or albumin.'" MTC Mem. at 6. To be clear, Plaintiffs agree that information concerning Plaintiffs' *purchases* of these therapies is relevant, and the direct purchaser plaintiffs already have produced such information to Defendants. To gather such downstream information, however, which is irrelevant, would impose a prodigious burden on Plaintiffs that

9

would far outweigh any marginal relevance of the material that Defendants can possibly articulate.[5]

### D. The Court Should Not Rule on Defendants' Request for Downstream Data from Indirect Plaintiffs.

Presumably aware of the obstacles they face in their quest for downstream information in the Direct Purchaser case, Defendants' efforts primarily are directed towards the plaintiff in the parallel indirect purchaser action, the County of San Mateo, California ("San Mateo"). Setting aside the potential legal infirmity of this effort, which counsel for the Direct Purchaser Plaintiffs leave to counsel for the indirect purchasers to articulate, a ruling on Defendants' requests to San Mateo by this Court would be premature. On January 9, 2012, Judge Gottschall ordered San Mateo to brief (1) whether the Court has subject matter jurisdiction over the indirect action; and (2) whether the indirect action should continue as part of this multi-district litigation. N. D. Ill. case no. 1:09-cv-07666, #408. That briefing was submitted on February 10, 2012 ("San Mateo Brief"). *Id.* #430. While San Mateo argues that the Court has subject matter jurisdiction over the indirect action, it "respectfully requests that the Court file a suggestion of remand with the MDL Panel, recommending that this action be sent back to the Northern District of California." *Id.* at 2. The question whether the indirect action will remain in this Court remains outstanding for the Court's determination. It would waste the time and resources of the parties and the Court to rule on this

---

[5] Defendants' motion to compel downstream discovery from the Direct Class Representatives was filed very recently, on Friday, February 10, 2012, even though Plaintiffs' objection to the production of such information has been a matter of record since last June. Notably, Defendants waited until Plaintiffs had completed their searches for documents and largely completed their productions before filing their motion to compel (or informing Plaintiffs that such a motion would be forthcoming). If the Court deems the information sought relevant, Plaintiffs respectfully request one week to provide detailed affidavits from the Plaintiffs setting forth the very substantial burden Defendants' request would impose so that the Court can consider the undue burden issue on a complete record.

discovery motion in the indirect action when the antecedent matter of whether the case will remain in this District is unresolved.

In any event, even if the Court does choose to consider Defendants' motion to compel against San Mateo, Defendants' arguments in support thereof should not affect the Court's consideration of Defendants' motion against *direct* purchaser Plaintiffs. It is well-settled that downstream discovery from direct purchaser plaintiffs is not permitted simply because a parallel indirect action is ongoing, whether or not downstream discovery is warranted in the *indirect* case. Courts have recognized that downstream data from a few direct purchaser plaintiffs is unlikely to provide any meaningful discovery in a corresponding indirect purchaser case, and that the burden it would impose on direct plaintiffs is thus unwarranted. *See* PO Mem. at 7, n. 6 (collecting cases); *see also In re K-Dur*, 2007 WL 5302308 at *14 (rejecting Defendants' request for "downstream discovery from the Directs so that they may determine whether questions of individualized injury and damages permeate the claims of the Indirects" because that information was not relevant to direct case and Defendants may be able to obtain the information from market reports); *In re Polyester Staple Antitrust Litig.*, 3:03CV1516, 2005 WL 6457181 at *5 (W.D.N.C. May 9, 2005) (recognizing that even if Defendants are entitled to challenge or rebut the amount of damages sought by indirect purchasers, "this presents an almost insurmountable obstacle in terms of determining what percentage of illegal pass-on is attributable to the respective alleged conspiracies" and that the likely benefit of the proposed downstream discovery from plaintiffs is negligible at best).

E.     **The Court Should Not Permit Discovery of Absent Class Members.**

Defendants do not address squarely Plaintiffs' claim that they should not be permitted to seek the discovery requested from absent class members. Indeed, Defendants' lack of attention to

11

this point is revealed by the fact that their section heading on page 12, "Secondary Distributors Are Not Absent Class Members," both contradicts their footnote 4 and has *nothing to do with* the paragraph that follows it. MTC Mem. at 9, 12. The fact remains, as was set forth in Plaintiffs' initial memorandum, that Defendants are required to meet an extremely high standard to justify discovery from absent class members, and they have not even *addressed*, let alone satisfied, this standard. PO Mem. at 9-10.[6]

Insofar as Defendants can be taken to have responded to Plaintiffs' argument that discovery of absent class members should not be permitted, they do so only elliptically. Defendants simply state that certain of the "Secondary Distributors" they have subpoenaed have in fact agreed to provide "information" to defendants. MTC Mem. at 6-7. Plaintiffs do not, of course, object to production from any subpoenaed entity that has itself agreed to provide documents to Defendants. The fact remains, however, that there is a recognized body of law governing the appropriateness of discovery from absent class members, and Defendants have failed to show that their requests meet those standards. Plaintiffs therefore reiterate their request that the Court should prohibit wholesale discovery of absent class members, beyond those who may have already agreed to produce certain documents to Defendants.

### III. CONCLUSION

For all of the above reasons, Plaintiffs respectfully request that Defendants' motion to compel be denied and Plaintiffs' motion for a protective order be granted.

---

[6] Indeed, as demonstrated above, Defendants cannot even satisfy the standard for obtaining the legally irrelevant discovery they seek from the direct purchaser class representatives – let alone from absent class members.

Date: February 13, 2012

| | |
|---|---|
| *s/Richard A. Koffman* | *s/Charles E. Tompkins* |
| **COHEN MILSTEIN SELLERS & TOLL PLLC** | **SHAPIRO HABER & URMY LLP** |
| Richard A. Koffman | Charles E. Tompkins |
| Christopher J. Cormier | Ian J. McLoughlin |
| Emmy L. Levens | Rachel M. Brown |
| Robert A. Cacace | 53 State Street |
| 1100 New York Avenue, NW | Boston, MA 02109 |
| Suite 500 West | |
| Washington, DC 20005 | *Plaintiffs' Steering Committee* |
| | |
| *Plaintiffs' Steering Committee* | |
| | *s/Deborah H. Bornstein* |
| | **FREEBORN & PETERS LLP** |
| | Deborah H. Bornstein |
| | Kathryn Thomas |
| | Garry Wills |
| | 311 S. Wacker Dr. |
| | Suite 3000 |
| | Chicago, IL 60606 |
| | |
| | *Plaintiffs' Liaison Counsel* |

**CERTIFICATE OF SERVICE**

  The undersigned, being one of the attorneys for the Plaintiffs, hereby certifies that he caused a copy of **DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DOWNSTREAM DISCOVERY AND DIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER** to be served upon the parties of record, as shown below, via the Court's CM/ECF system on the **13th** day of **February, 2012**.

| | |
|---|---|
| Stephen R. Freeland<br>Richard D. Milone<br>KELLEY DRYE & WARREN LLP<br>3050 K Street, NW<br>Suite 400<br>Washington, DC 20007<br>Telephone: 202-342-8400<br>Facsimile: 202-342-8451<br>E-mail: sfreeland@kelleydrye.com<br>     rmilone@kelleydrye.com<br><br>*Attorneys for Defendant Plasma Protein Therapeutics Association* | Matthew C. Luzadder<br>Stephen A. Wood<br>John C. Pirra<br>KELLEY DRYE & WARREN LLP<br>333 W. Wacker Drive, Suite 2600<br>Chicago, Illinois 60606<br>Telephone: 312-857-7070<br>Facsimile: 312-857-7095<br>E-mail: mluzadder@kelleydrye.com<br>     swood@kelleydrye.com<br>     jpirra@kelleydrye.com<br><br>*Attorneys for Defendant Plasma Protein Therapeutics Association* |
| David J. Zott<br>Daniel E. Laytin<br>Christa C. Cottrell<br>Luke C. Ruse<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Telephone: 312-862-2000<br>Facsimile: 312-862-2200<br>E-mail: david.zott@kirkland.com<br>     daniel.laytin@kirkland.com<br>     christa.cottrell@kirkland.com<br>     luke.ruse@kirkland.com<br><br>*Attorneys for Defendant Baxter International Inc.* | Vanessa M. Heftman<br>Brian D. Roche<br>REED SMITH LLP<br>10 South Wacker Drive<br>40th Floor<br>Chicago, Illinois 60606-7507<br>Telephone: 312-207-1000<br>Facsimile: 312-207-6400<br>E-mail: vheftman@reedsmith.com<br>     broche@reedsmith.com<br><br>*Attorneys for Defendants CSL Behring LLC and CSL Limited* |

| | |
|---|---|
| Andrew M. Lacy<br>SIMPSON THACHER & BARTLETT LLP<br>1155 F Street N.W.<br>12th Floor<br>Washington, DC 20004<br>Telephone: 202-636-5500<br>Facsimile: 202-636-5502<br>E-mail: alacy@stblaw.com<br><br>*Attorneys for Defendants CSL Behring LLC and CSL Limited* | Kevin J. Arquit<br>Aimee H. Goldstein<br>Alan Turner<br>SIMPSON THACHER & BARTLETT LLP<br>425 Lexington Avenue<br>New York, NY 10017-3954<br>Telephone: 212-455-2000<br>Facsimile: 212-455-2502<br>E-mail: karquit@stblaw.com<br>agoldstein@stblaw.com<br>aturner@stblaw.com<br><br>*Attorneys for Defendants CSL Behring LLC and CSL Limited*<br><br>By:   /s/ Garry L. Wills<br>**FREEBORN & PETERS LLP**<br>Deborah H. Bornstein<br>Kathryn Thomas<br>Garry L. Wills<br>311 S. Wacker Dr.<br>Suite 3000<br>Chicago, IL 60606<br>Telephone: 312-360-6000<br>Facsimile: 312-360-6571<br>E-mail: dbornstein@freebornpeters.com<br>kthomas@freebornpeters.com<br>gwills@freebornpeters.com<br><br>*Plaintiffs' Liaison Counsel* |